FRANKLIN H. COCHRAN & others *vs.* EDWARD W. ROEMER & others.

Suffolk. December 5, 1933. — September 12, 1934.

Present: RUGG, C.J., CROSBY, FIELD, DONAHUE, & LUMMUS, JJ.

*Zoning. Mandamus. Practice, Civil,* Report. *Words,* "Building," "Coal," "Coal elevator."

Where a single justice of this court reported for determination by the full court a petition for a writ of mandamus upon the pleadings, the report of an auditor, a statement of agreed facts made by the parties, and facts found by him, no question pertaining to the exercise of discretion was involved; the question presented was whether, upon all the facts and upon the pleadings, the writ of mandamus ought to issue as matter of law.

It *was stated* that, aside from § 9 of the zoning law of the city of Boston, St. 1924, c. 488, pertaining to "nonconforming uses," the erection and use of buildings for the storage and sale of coal and coke on land in a district in Boston zoned for local retail business would be prohibited by §§ 5, 6 (10) of the zoning law.

It is a plain implication from the terms of said § 9 that a "nonconforming use" of property not only may be continued but also may be increased, subject to the restrictions contained in § 9.

It *was stated* that the words, "will not be detrimental or injurious to the character of the neighborhood," in said § 9 apply only to the granting of permits for the "enlargement or alteration of existing buildings," and not to the granting of permits for the erection of "additional buildings."

From 1918 to 1929, a small coal and coke business, chiefly of a local nature, was conducted on a parcel of land in a district in Boston zoned for local retail business and generally for buildings not more than forty feet in height. The premises, as so used, were disorderly in appearance. The land in the neighborhood was partly residential and partly used for business. In 1929 a fuel company bought the land, and,

having obtained from the building commissioner a permit to erect a "coal elevator," erected on the land a large concrete structure, about eighty-three feet in height, consisting of six separate silos connected at the top and containing modern appliances, and designed for the storage of coal and coke, which was brought there on cars on adjacent railroad tracks, and for the transfer of the fuel into trucks for delivery to customers. On the top of the structure was a large electric sign. The fuel company thereafter conducted on the premises a large volume of business in coke. Such business caused noise and greatly increased traffic on the nearby streets, although the premises were less dirty and dusty than before, and was a greater drawback to the development of the neighborhood as a residential section than was the business previously conducted on the premises. *Held*, that

(1) The business of the fuel company, although it was greater in volume and conducted by different methods, was not different in kind from the business previously conducted on the premises, which had been permitted as a "nonconforming use" of the premises by St. 1924, c. 488, § 9;

(2) It could not be said as a matter of law that the new structure of the fuel company was "detrimental or injurious to the character of the neighborhood" within the meaning of those words in said § 9, even assuming that the restricting phrase in which those words are contained is applicable to the granting of permits for the erection of "additional buildings";

(3) The structure was a "building" within the commonly accepted meaning of that word;

(4) Although the structure was being used only as a coke elevator, it was a "coal elevator" within the meaning of the provision in St. 1905, c. 383, § 4, in the amended form appearing in St. 1923, c. 462, § 27, that "No limitations of the height of buildings . . . in . . . Boston shall apply to . . . coal . . . elevators [or] . . . signs . . .";

(5) The structure did not violate the zoning law of Boston.

It was unnecessary, in the circumstances, to decide whether either the business conducted by the fuel company as above described or the business previously conducted on the premises was wholesale or retail.

PETITION for a writ of mandamus, filed in the Supreme Judicial Court for the county of Suffolk on May 13, 1931.

The case was referred to an auditor, and afterwards was heard by *Donahue*, J., who reported it for determination by the full court, as described in the opinion. Material facts are stated in the opinion.

*F. R. Walsh*, (*T. A. Cronin* with him,) for the petitioners.

*T. Hunt*, (*J. C. Reilly* with him,) for New England Fuel and Transportation Company.

*H. M. Pakulski*, Assistant Corporation Counsel, for the respondents.

RUGG, C.J.   This is a petition for a writ of mandamus.
The petitioners own properties in the immediate neighbor-
hood of land on which it is alleged that certain structures
have been erected in violation of the Boston zoning law
by the New England Fuel and Transportation Company, a
voluntary association under a declaration of trust.   That
association has been admitted on its own motion as a party
respondent.   It has filed an answer and participated in the
trial and argument.   G. L. c. 249, § 5; *Siegemund* v. *Build-
ing Commissioner of Boston*, 259 Mass. 329, 335.   Hereafter,
it will be referred to as the fuel company.   The prayers of
the petition are that the respondent, the building commis-
sioner of Boston, be directed to revoke permits granted by
him to the fuel company for erection of buildings on the
land, to institute proceedings to restrain the fuel company
from maintaining its buildings and conducting a wholesale
business, and to enforce otherwise the provisions of the zon-
ing law against the fuel company.

An auditor was appointed, whose report contains a
recital of the facts in considerable detail.   The parties also
filed a statement of agreed facts in addition to and in slight
alteration of facts found by the auditor.   All these facts
were found to be true by the single justice, who after hear-
ing found additional facts.   He then reported the case for
determination upon the pleadings, the auditor's report,
the statement of agreed facts, and the facts found by him.

On a report in this form, no exercise of discretion is
involved.   The question presented is whether upon all the
facts found and upon the pleadings the writ of mandamus
ought to issue as matter of law.   *Hunter* v. *School Com-
mittee of Cambridge*, 244 Mass. 296.   *School Committee of
Lowell* v. *Mayor of Lowell*, 265 Mass. 353, 354, and cases
cited.   *Shawmut Mills* v. *Board of Assessors of Fall River*,
271 Mass. 358.

The facts summarily stated are these: The properties
of the several petitioners are in a district zoned for resi-
dential purposes only, except that the rear of one lot is in
a district zoned chiefly for local business.   The land of the
fuel company concerned in the case is on Ballou Avenue in

that part of Boston known as Dorchester. It is situated in a district zoned for local retail business. It contains forty-two thousand three hundred eighty-five square feet. It lies in the shadow of the bridge which carries Norfolk Street, a main highway of travel from Boston to the south, across the tracks of the Midland Division of the New York, New Haven and Hartford Railroad and is lower than the railroad and still lower than the highway. Norfolk Street in the neighborhood of the bridge is given over to business. Ballou Avenue is generally residential. On the northerly side of the land is a vacant lot, and beyond that are three-family houses; on the easterly side is the railroad location; on the southerly side is one house within a few feet, and beyond, a thickly settled locality; on the westerly side is a rough vacant lot of about an acre given over to junk, refuse, underbrush and weeds, and, farther away, there are small dwellings. On this land of the fuel company, from 1918 to 1929, one Berzon conducted a small retail coal and coke business amounting to seventy-five hundred to eight thousand tons of coal per year. The coal for the most part was stored in the open and was loaded on trucks by a portable loading machine. There was no flooring over the dirt. There were a small office building and a large rough shed divided into bins, where various sizes of anthracite coal were stored. On the northerly side of the lot was an old fence made up mostly of worn out doors and refuse lumber. On the Ballou Avenue side was a wooden fence in disrepair. The entire plant was untidy in appearance and in a disorderly condition, and looked a good deal like the dump across the street. It was much dustier and dirtier than it is as now operated by the fuel company. Berzon conducted in general a small local business, except that he made deliveries to customers who had lived in the district but had moved away to other cities and towns and still traded with him. Occasionally he sold coal to other dealers for cash or credit at a price lower than to the retail trade. The volume of this business in comparison with his retail trade is not shown.

The fuel company manufactures coke and its by-prod-

ucts at its plant in Everett. The fuel company bought the land and the business of Berzon in 1929. It made a complete change. The only part of the old structures now upon the land is the former office building, moved to a corner of the lot and used for petty storage and a rest room for chauffeurs. The fuel company has erected a large concrete structure, placed practically in the middle of the area, consisting of six silos, built of reinforced concrete, each of an outside diameter of twenty-two feet. Most of the land is covered with a concrete slab and the silos rise to approximately eighty-three feet above the concrete yard. Between the silos there is a little space, perhaps ten feet, and at the top of the structures and going across the top of the silos is what might be called a long corridor. These silos stand parallel with the railroad. There are two railroad sidings, both parallel with the main tracks. One siding is entirely upon land of the railroad company. The other is upon land of the fuel company. An enclosed pit is under a portion of one of the tracks, from which by a hoisting mechanism coke is lifted in a metallic bucket holding about two tons to the top of the several silos. The bucket then descends inside the silos to the surface of coke already there and is automatically discharged. In this way a car load may be transferred in about forty-five minutes. Driveways are constructed through the bottom of each silo with openings so that it is possible to load twelve trucks at one time, six on each side of the silos. There are devices for sifting the coke inside the silos so that it goes through chutes into trucks as free from dust as is possible. The plant represents the most modern construction for compact storage of coke and service to trucks for distribution. On the top of the silos is a "large neon light sign" announcing in red the name of the fuel company "in six-foot letters." The fuel company sells its coke throughout New England. A very large proportion is sold in Boston and the metropolitan area. For the most part it sells coke at retail and delivers it within a radius of fifteen miles from Boston. Before the establishment of the plant in question, its sales to domestic consumers in Dorchester were delivered by

trucks from the Everett plant, and those to dealers by railroad. It made plans for establishing the Dorchester plant in 1929. Requisites for a suitable site were that it must be reached by railroad within practically five miles from the South Station in order to be within the switching limit, land about one acre in area of long and narrow dimensions in order to permit deliveries from the railroad, and a location near the center of the territory to be served by distribution from it. The land in question was the only site found after extensive search to fulfil these requirements. The investment made in the plant is a trifle more than $240,000. If obliged to abandon this site and raze the plant, the salvage to the fuel company would not exceed $25,000, including the value of the land. The fuel company, before buying the land, showed its plans to the building commissioner of Boston in conference with one in charge of the zoning division, and explained what it proposed to do and the grounds for such action, and was told that there was no reason why the necessary permits would not be granted. The permit issued by the building commissioner was for building coal elevators. Coal requires stronger construction on account of its extra weight, so the fuel company desired elevators suitable for coal in the event it needed so to use them, although its initial purpose was to use them for coke. The elevators are suitable and usable for both. Coke is lighter and has less dust and dirt than coal. The noise of loading and unloading coke is less than that of coal. While there is some dust attendant upon the operation of the silos, the amount is not more than might be expected in the immediate neighborhood of a railroad track. The auditor was unable to find how much was due to each cause. A great volume of retail and wholesale business has been conducted by the fuel company at this location. Berzon had two or at most three trucks, but there have been occasions under the operation by the fuel company when twenty-eight trucks have been waiting to be loaded. As a consequence, the traffic on Ballou Avenue and adjacent streets has greatly increased and is heavy during longer parts of each day. All deliveries made by

the fuel company from the plant are by truck, eighty per cent being in two-ton trucks mostly owned by it, and none of the others being larger than five-ton trucks. The five-ton trucks frequently carry deliveries for five customers, one ton to each. Ninety-eight per cent of the coke is used for heating and cooking purposes in the home. The remaining two per cent is used by tailors, laundries and businesses of that nature. About twenty-seven per cent of the business consisted of sales to dealers who carried the coke off in their own conveyances at a price less than that charged to the ordinary householder. The auditor found that the presence of the business of Berzon was a drawback to the development of the neighborhood as a residential section, that the plant of the fuel company was a substantially greater drawback, that it was unlikely that vacant land immediately adjoining the plant would be used for residential purposes, and that the presence of the silos and the heavy traffic incident to the enlarged business have caused a substantial decrease in the value of real estate and are a detriment to the development and comfort of the neighborhood. The noise coming from the plant arises from shifting locomotives, bumping of cars, loads of coke falling into trucks, the metallic bucket conveying coke into the silos, and the operation of trucks. All these noises are intimately tied up with the size of the business and are reasonable if business of that size is permissible.

The relevant statutes are several sections of the Boston zoning law. St. 1924, c. 488. It is prescribed by § 5 respecting local business districts, within which this land is situated, that "no building or premises shall be erected, altered or used for any use prohibited in a general business district as provided in section six, . . . or for any use except one or more of the following: . . . (7) Any other retail business or service not involving any manufacture on the premises . . . ." It is provided by § 6 respecting a general business district that "no building or premises shall be erected, altered or used for any of the following specified trades, industries or uses: . . . (10) Coal, coke or wood yard . . . ." These two sections, if they stood

alone, would prohibit the use made by the fuel company of the premises in question. Such use comes within the prohibition of § 6 (10) imported into § 5 by its first clause. That prohibition is not relaxed by the words "Any other retail business or service" in (7) of § 5. Those words are operative in the restricted field not comprehended within the absolute prohibition with which that section opens. That prohibition, however, is subject to the exception contained in § 9, entitled "Non-conforming uses." It is there provided: "Any lawful use of a building or premises . . . existing at the time of the taking effect of this act may be continued, although such use does not conform with the foregoing provisions hereof. . . . The building commissioner may grant a permit for the erection of additional buildings or for the enlargement or alteration of existing buildings on the same or an adjacent parcel of land, each in the same single or joint ownership of record at the time it is placed in a use district, for a trade, business, industry or other use prohibited in such district where such enlargement or alteration will not be detrimental or injurious to the character of the neighborhood . . . ."

The business conducted by Berzon at the time the Boston zoning act took effect was a coal and coke business. That was a nonconforming use within the meaning of § 9 of St. 1924, c. 488. The words of that section mean that the lawful use of the premises existing at the time the zoning act took effect may be continued by the owner or his successor. The fuel company is the successor of that business by purchase. The use made by the fuel company of the premises is the same in substance as that made by Berzon. In some respects it is less objectionable, although in other particulars it may be more disagreeable. It is storing coke and selling it in large part to the immediate consumer, but to some extent to dealers for resale. In a much smaller way Berzon did the same business. The differences between the business conducted by Berzon and that of the fuel company are mainly in magnitude and in method. Berzon conducted by an old system a small business chiefly at retail with comparatively few sales to other dealers. The

fuel company conducts a very large business by the most modern appliances for the most part by sales to the ultimate consumer but to a considerable extent to other dealers for resale. The business of the fuel company is not different in kind from that of Berzon simply because it is bigger.

The auditor took the position that sales to ultimate consumers at a price greater than that paid by dealers is retail business, and that sales to dealers at the smaller price is wholesale business. It is open to doubt whether this is a correct statement of the abstract principle differentiating wholesale from retail business under our decisions. *Commonwealth* v. *Greenwood*, 205 Mass. 124. *Great Atlantic & Pacific Tea Co.* v. *Cream of Wheat Co.* 227 Fed. Rep. 46. However that may be, treated as a finding of fact descriptive of the business carried on respectively by Berzon and by the fuel company, it is to be accepted. It conforms to subsidiary facts found. Whether the business of each or either is wholesale or retail need not be determined. The business is nonconforming. The provisions of § 9 make no distinction based on wholesale or retail features as applied to the facts here disclosed. The case at bar is quite distinguishable from *Lexington* v. *Bean*, 272 Mass. 547, where a business different in kind was involved.

It is the plain implication of the terms of § 9 that such nonconforming use may be not only continued but also increased in size. There is no restriction on the magnitude of the growth of such business, except that it must be confined to the same premises or an adjacent parcel. The words of that section do not lend themselves to a contrary construction. Nonconforming business is lawful in itself. The business in question appears to be necessary for the welfare of the community. It is with reference to such a business that § 9 was framed. It authorizes the building commissioner to issue permits for "additional buildings" and also for the "enlargement or alteration of existing buildings." That section contains no limitation upon the issuance of permits for "additional buildings." Permits for "the enlargement or alteration of existing buildings" are restricted, however, to cases where "such enlargement or

alteration will not be detrimental or injurious to the character of the neighborhood." The construction of this part of § 9 leaves permits for additional buildings to be issued with reference to governing laws and ordinances as to new buildings without further limitations. It places the additional restriction on enlargement and alteration alone. This is in harmony with the legislative purpose in preserving existing nonconforming use against the constraints of the zoning law. Enlargements or alterations of existing buildings well might require special statutory treatment, while new buildings naturally would be left to the operation of general regulations.

The findings, however, do not require the conclusion as matter of law that the new buildings of the fuel company are detrimental or injurious to the "character of the neighborhood." The noise and dust are incident to the proximity to the main line of a railroad. The coal and coke business is there as it was before; in many respects less obnoxious; in some, more offensive. The neighborhood remains residential, as it was before. Its character in that respect has not changed. Although the case is close upon this point, it cannot quite be held that the writ ought to issue on this ground even if it be assumed that the limiting words of § 9 apply to a permit for a new building.

The silos are buildings within the commonly accepted meaning of the word. *Small* v. *Parkway Auto Supplies, Inc.* 258 Mass. 30, and cases cited. *Jenney* v. *Hynes*, 282 Mass. 182, 190; *S. C.* 285 Mass. 332. The height of such buildings generally is limited to forty feet in the "L-40" district where the silos are situated. St. 1924, c. 488, § 12. There is an exception created by St. 1905, c. 383, § 4, most recently amended by St. 1923, c. 462, § 27, to the effect that "No limitations of the height of buildings . . . in . . . . Boston shall apply to . . . coal or grain elevators [or] . . . signs . . . ." The silos were described in the permit as "coal elevators." They are capable of being used as coal elevators and in design and strength are adapted for that purpose. That they are used as coke elevators does not prevent them from being rightly termed coal elevators.

To that extent the word "coal" in the statute may be used in a comprehensive or generic sense to include coke, a kind of coal from which certain volatile gases have been removed by heat. "Coal elevator" is descriptive of a type of structure, its strength and material. These are the dominating factors determining its nature rather than the precise use to which it is at the moment devoted. These structures as well as the sign fall within the exception and are not violative of the statutory limitation as to height.

It is not necessary to pass upon the exception to the admission of Exhibit 13, which was the opinion to the vice-president of the fuel company as to the availability of the site. It has become immaterial and has not been considered in deciding the case.

The case has been treated on the footing that the issuance of the building permit and the erection of the building would afford the fuel company no immunity for violation of the zoning law. *Wood* v. *Building Commissioner of Boston*, 256 Mass. 238, 242. *Bianchi* v. *Commissioner of Public Buildings of Somerville*, 279 Mass. 136, 140.

These considerations require the conclusion that the petitioners are not entitled as matter of law to the relief sought. Regard has been had to all their arguments, but further discussion is unnecessary.

*Petition dismissed.*