MARTYN H. LINCOLN & others *vs.* SECRETARY OF THE
COMMONWEALTH.

Suffolk.    July 21, 1950. — August 4, 1950.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, SPALDING, WILLIAMS,
& COUNIHAN, JJ.

*Constitutional Law*, Initiative, Opinions of the Justices.

A question dealt with in an advisory opinion of the Justices, upon being
    subsequently raised in litigation, must be considered anew by this
    court unaffected by the previous opinion.
The provision of art. 48 of the Amendments to the Massachusetts Con-
    stitution, General Provisions, II, "Not more than one-fourth of the
    certified signatures on any petition shall be those of registered voters
    of any one county," did not invalidate a certain initiative petition
    having approximately thirty-four thousand certified signatures where
    more than one fourth of such total were of voters of each of two counties,
    but the signatures were so distributed that the required minimum
    number of twenty thousand could be attained without counting more
    than five thousand from any one county; QUA, C.J., and RONAN &
    SPALDING, JJ., dissenting.

PETITION for a writ of mandamus, filed in the Supreme
Judicial Court for the county of Suffolk on June 6, 1950.

The case was reserved and reported by *Lummus*, J.,
without decision.

The single justice ordered that Harold W. Canavan, "one
of the original ten signers of the initiative petition," be
"given leave to file a brief herein, before the full court."

The case was submitted on briefs.

*C. B. Rugg, F. W. Grinnell, & W. F. Farr,* for the peti-
tioners.

*F. E. Kelly,* Attorney General, *L. E. Ryan,* Assistant
Attorney General, *& J. J. Kelleher,* for the respondent.

*V. A. Canavan,* for the intervener.

WILKINS, J.  The petitioners, registered voters, seek a
writ of mandamus commanding the respondent Secretary of

the Commonwealth to refrain from certain acts having to do with the submission to the people at the next State election of a proposed law, the subject of an initiative petition, on the ground that there has not been compliance with art. 48 of the Amendments to the Constitution. The proposed law, entitled "An Act providing that classifications of risks and premium charges under the compulsory motor vehicle liability insurance law shall be uniform throughout the commonwealth," has been the occasion of an advisory opinion, dated May 24, 1950, in which a majority of the Justices of this court took the view that there had been compliance with art. 48. *Opinions of the Justices, post,* 781. In accordance with our duty, we examine the question anew, unaffected by the advisory opinion. *Commonwealth* v. *Welosky,* 276 Mass. 398, 400. *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 245, note.

After the case was heard upon the pleadings and a statement of agreed facts, a single justice found the facts to be as agreed, and at the request of the parties reserved and reported the case without decision for the determination of this court. G. L. (Ter. Ed.) c. 211, § 6; c. 231, § 111. No exercise of discretion is involved. The question for decision is whether upon the pleadings and the facts found the writ of mandamus ought to issue as matter of law. *Cochran* v. *Roemer,* 287 Mass. 500, 502. *Attorney General* v. *Secretary of the Commonwealth,* 306 Mass. 25, 27. *Crudden* v. *Superintendent of Schools of Boston,* 319 Mass. 686, 687.

The method of originating an initiative petition now appears in art. 74, § 1, which amends art. 48, The Initiative, II, § 3. The petition must first be signed by ten qualified voters and submitted to the Attorney General for certification. See *Howe* v. *Attorney General,* 325 Mass. 268. The Secretary of the Commonwealth shall provide blanks for the use of subsequent signers. "All initiative petitions, with the first ten signatures attached, shall be filed with the secretary of the commonwealth not earlier than the first Wednesday of the September before the assembling of the general court into which they are to be introduced, and

Lincoln *v.* Secretary of the Commonwealth.

the remainder of the *required signatures*[1] shall be filed not later than the first Wednesday of the following December." Art. 74, § 1. "If an initiative petition, signed by the *required number* of qualified voters, has been filed as aforesaid, the secretary of the commonwealth shall, upon the assembling of the general court, transmit it to the clerk of the house of representatives, and the proposed measure shall then be deemed to be introduced and pending." Art. 48, The Initiative, II, § 4. "If an initiative petition for a law is introduced into the general court, signed by *not less than twenty thousand qualified voters,* a vote shall be taken by yeas and nays in both houses before the first Wednesday of June upon the enactment of such law in the form in which it stands in such petition. If the general court fails to enact such law before the first Wednesday of June, and if such petition is completed by filing with the secretary of the commonwealth, not earlier than the first Wednesday of the following July nor later than the first Wednesday of the following August, *not less than five thousand signatures* of qualified voters, in addition to those signing such initiative petition, which signatures must have been obtained after the first Wednesday of June aforesaid, then the secretary of the commonwealth shall submit such proposed law to the people at the next state election." Art. 48, The Initiative, V, § 1. See *Brooks* v. *Secretary of the Commonwealth,* 257 Mass. 91, 96–97.

On September 8, 1949, there was filed in the respondent's office the present initiative petition signed by ten qualified voters of the Commonwealth and accompanied by the requisite certificate of the Attorney General. On December 7, 1949, there were filed in the respondent's office thirty-four thousand thirty-four certified subsequent signatures of qualified voters from various counties as follows: Worcester, seventy-two; Plymouth, eight hundred twenty-seven; Norfolk, seven thousand three hundred ninety-seven; Essex, seven thousand eight hundred forty-six; Middlesex,

---

[1] Italics are supplied in the quotations from arts. 48 and 74.

eight thousand nine hundred sixty-four; and Suffolk, eight thousand nine hundred twenty-eight. More than one fourth of the total signatures filed were those of voters of Suffolk County, and more than one fourth were those of voters of Middlesex County. On January 4, 1950, the respondent transmitted the initiative petition to the clerk of the House of Representatives. The General Court failed to enact the proposed law before the first Wednesday of June, there being adverse votes in the House of Representatives on April 12, 1950, and in the Senate on June 5, 1950.

The respondent's answer sets up special matters in lieu of demurrer, which, as the result will not be affected, we need not discuss. We are thus enabled to rest this decision of a majority of the court upon the merits of the question heretofore considered in the advisory opinion.

The sole ground for the contention that there has not been compliance with art. 48 of the Amendments is contained in General Provisions, II, reading, "Not more than one-fourth of the certified signatures on any petition shall be those of registered voters of any one county." Referring to this provision, this court said, in *Commonwealth* v. *Littleton*, 260 Mass. 423, 425, "Its purpose is to make certain that the petition has substantial support throughout the Commonwealth before submitting the question to popular vote."

Adopting and affirming what was said in *Opinions of the Justices, post*, 781, 789, "The issue now is whether this provision has a further purpose to make certain that the petition does not have relatively too much support in any one county in the sense that the petition must fail if by actual count of all the signatures certified locally and filed with the Secretary of the Commonwealth it should eventuate that more than one fourth are from a single county. We think that this provision does not have such an effect, but merely indicates a purpose to limit the number of certified signatures which can be counted in order to attain the required total — in this case twenty thousand — to not more than one fourth of that total in any one county. . . .

In our opinion the provision limits the number of certified signatures to be counted to five thousand from a single county with the result that there are available to be counted the following: Worcester seventy-two, Plymouth eight hundred twenty-seven, the other four counties five thousand each, or a total of twenty thousand eight hundred ninety-nine."

General Provisions, II, is not to be viewed as an isolated sentence, but the amendment of which it is a part should be read as a whole. If possible, the amendment must be construed so as to accomplish a reasonable result and to achieve its dominating purpose. Its words should be interpreted in the sense most obvious to the common intelligence, because a matter proposed for public adoption must be understood by all entitled to vote. *Tax Commissioner* v. *Putnam*, 227 Mass. 522, 524. *Attorney General* v. *Methuen*, 236 Mass. 564, 573. *Raymer* v. *Tax Commissioner*, 239 Mass. 410, 412. *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365, 366–367. *Mount Washington* v. *Cook*, 288 Mass. 67, 70. *General Outdoor Advertising Co. Inc.* v. *Department of Public Works*, 289 Mass. 149, 158.

Reading the amendment as a whole, we think that General Provisions, II, does not stand out so insulated from, and so unrelated to, the rest of arts. 48 and 74 that the imposition of the burdensome restriction contended for by the petitioners is unescapable.

The beginning of art. 48 is: "I. Definition. Legislative power shall continue to be vested in the general court; but the people reserve to themselves the popular initiative, which is the power of *a specified number of voters* to submit constitutional amendments and laws to the people for approval or rejection; and the popular referendum, which is the power of *a specified number of voters* to submit laws, enacted by the general court, to the people for their ratification or rejection."

The meaning of the "specified number" of voters referred to in I, Definition, of the "required signatures" in art. 74, § 1, and of the "required number" in art. 48, The

Initiative, II, § 4, appears from a reading of the entire art. 48. These numbers are: (1) Constitutional amendment introduced by initiative petition, "not less than twenty-five thousand." The Initiative, IV, § 2. (2) Initiative petition for a statute, "not less than twenty thousand" in order to require a vote of the Legislature; and after a failure to enact, "not less than five thousand" additional to place upon the ballot. The Initiative, V, § 1. An amendment by the first ten signers following a failure to enact, "not less than five thousand." The Initiative, V, § 2. (3) A petition for the suspension of a law and a referendum thereon, "not less than fifteen thousand." The Referendum, III, § 3. (4) A petition for referendum on an emergency law or a law the suspension of which is not asked for, "not less than ten thousand." The Referendum, III, § 4.

Nothing is said in art. 48 about certification of signatures except at the very end in "General Provisions." Up to that final portion, the emphasis throughout is upon minimum numbers of voters or signatures, specified or required. In our opinion, the reference in General Provisions, II, to "certified signatures on any petition," must reasonably refer to the various types of petitions described in art. 48 and outlined above. We cannot bring ourselves to believe that it was thereby intended by way of conclusion to impose a new and variable requirement as to the number of certified signatures which might be filed with the Secretary of the Commonwealth. We fail to find in "any" a word of superlative emphasis. The Debates in the Massachusetts Constitutional Convention of 1917–1918 significantly shed no light upon any reason for the limitation urged by the petitioners. No purpose of such a limitation now suggested impresses us.

No contention has been made that General Provisions, II, applies to signatures certified locally, but not filed with the Secretary. Yet there is nothing in the one sentence in General Provisions, II, expressly excluding such an interpretation, which nevertheless, from a reading of the whole amendment, we agree, should be rejected as lacking in rea-

sonableness.  It is unlikely that the Constitutional Convention or the people could have thought that the legislators or the public would be limited in their knowledge to the number of certified signatures filed or could be impressed only in that manner.  If it be imagined that there was objection to too much support in one county, the amendment, to be truly effective in that regard, would surely have been made applicable at least to signatures certified and not filed.  It is no answer to assert that because of hostility to petitions with large numbers of signatures the purpose of General Provisions, II, is to restrict the total number of signatures to be filed from all counties.  Such a restriction, capable of expression in simple terms, in our judgment would be wholly repugnant to the apparently complete efficacy attributed to the minimum numbers previously specified or required in art. 48.  Only an unequivocal expression, wholly missing here, could qualify or undo that apparently complete efficacy, to our way of thinking.  In so declaring, we insist that we are not amending the constitutional provision, but that we are interpreting its words in the sense most obvious to the common intelligence, in the way that the ordinary voter must have understood them, and in a way that does not render illusory these reserved rights of the people.  The unfortunate contrary result reached by the minority opinion we believe to be due to oversimplification of the issue.

While we do not rely upon administrative interpretation in the office of the Secretary, it is reassuring, upon inspecting the findings of fact, to realize that our conclusion is in accord with the uniform practice of that office since the initiative and referendum became part of the Constitution, and that we are not giving approval to a novel result which would render doubtful the validity of any laws heretofore adopted in either manner.

Another consideration of great weight in construing this constitutional amendment designed to safeguard popular rights lies in the issuing of blanks to subsequent signers.  In this connection we adopt and affirm what was said in *Opinions*

*of the Justices, post*, 781, 791. "In several places in art. 48 appear the words, 'The secretary of the commonwealth shall provide blanks for the use of subsequent signers . . . .' The Initiative, II, Initiative Petitions, § 3. The Referendum, III, Referendum Petitions, §§ 3, 4. We see no reason to suppose that these blanks, which are provided at the expense of the Commonwealth, can be issued only to the ten original signers or at their request. If the test of validity or invalidity under General Provisions, II, is the presence on file in the office of the Secretary of the Commonwealth of certified names from one county amounting to more than one fourth of the total of all names filed, opponents of a petition, or even its misguided friends not associated with the original signers, could sabotage or wreck a measure by insisting upon obtaining blanks for the use of subsequent signers, and overloading the petition with a large number of certified signatures filed from a single county. In other words, there is not necessarily one group which can control the procedure or limit the number of certified names filed. Should it be thought that the penalty of invalidation ought to be visited upon a petition with relatively too much support in one county, there would be no sure means of avoiding it. The outcome could resemble a lottery. We think that it was not intended that the exercise of the popular right of the initiative or the referendum thus might be jeopardized by procedure." We reject the assertion of the petitioners that the Legislature under the guise of facilitating the operation of the provisions of the amendment (General Provisions, VII) could limit the distribution of the blanks to the ten original signers or their representatives and so deprive any voter of the right to receive blanks for the use of subsequent signers afforded by other provisions of art. 48. In respect to receiving such blanks the first ten signers are in no different position from and have no greater right or interest than the other signers of the petition. See *Morrissey* v. *State Ballot Law Commission*, 312 Mass. 121, 136.

A petition of two thousand certified names from each of

ten counties would be admittedly valid. We fail to see in General Provisions, II, an intent to invalidate such a petition and to disfranchise its twenty thousand signers in the event that more than one hundred thousand names from an eleventh county should also be filed. We cannot believe that the "specified number" referred to in the amendment is an uncertain figure which not only meets the minimum requirements but which also is contingent upon what total number of all valid signatures filed may turn out to be not less than four times the number of valid signatures filed from any one county.

*Petition dismissed.*

The Chief Justice and Justices Ronan and Spalding are unable to join in the foregoing opinion.

The issue depends upon the interpretation of one simple sentence which constitutes subheading "II. Limitation on Signatures" under the heading "General Provisions" in art. 48 of the Amendments to the Constitution. That sentence reads, "Not more than one-fourth of the certified signatures on any petition shall be those of registered voters of any one county."

The purpose of the "General Provisions," placed as they are at the end of the article, is to assist, qualify, limit, and control the provisions which have gone before. The quoted sentence constitutes the entire subheading "II. Limitation on Signatures." There is nowhere else in the "General Provisions" or in art. 48 anything mentioning the distribution of signatures among the counties. To that sentence, properly interpreted, we must look in order to determine what was intended relative to such distribution.

The words "certified signatures on any petition" mean those certified in the manner required by law and filed with the Secretary of the Commonwealth. So far as we are aware no one disputes this. The sentence in question says that not more than one fourth of these signatures shall be those of registered voters of any one county. The opinion

of the court holds, however, in substance, that this sentence, when read in connection with other parts of art. 48, is to be taken to mean only that not more than one fourth of the *minimum number of* certified signatures *required to be* on any petition shall be those of registered voters of any one county. This is not what the sentence says. The sentence can be made to mean this only by inserting into it the words italicized above or their equivalent. The sentence as drawn by the Constitutional Convention of 1917–1918 and adopted by the people is perfectly clear as it stands. It is not in any sense obscure or ambiguous. It must be assumed to have been framed with care to express the precise meaning intended. No other part of art. 48 or of the Constitution as a whole, when read with the sentence in question, requires that such interpolations be made in that sentence. It is neither impossible nor necessarily impractical to operate the initiative or referendum without doing violence to the apparent meaning of that sentence. The framers of the sentence, for aught we know, may have intended that the requirement of dispersion of signatures should apply to the total number filed and not merely to the minimum number that might have been filed. They knew that the number of signatures "on any petition" would probably exceed the minimum number required, and yet in the sentence in question they said that they based the limitation upon the number "on any petition." They could very easily have said that they based the limitation upon the minimum number required to be on any petition, if they had desired to do so. As the presently dissenting Justices said in their opinion to the Senate dated May 24 last, "It might have been thought that if proponents of measures desired to avail themselves of the impression upon legislators and the public of massive petitions they should demonstrate a corresponding breadth of demand among the counties of the Commonwealth, and that in no case should a petition be overweighted with the special interests of a particular locality. At any rate, we cannot say that this was not so. . . . We cannot convince ourselves that it was intended

that a petition of one hundred thousand names of which eighty-five thousand should come from the county of Suffolk and five thousand should come from each of three other counties should be deemed good through a mental process of striking out eighty thousand names, all from Suffolk, and none from any other county, and keeping the remaining five thousand from Suffolk. We do not see how the words of General Provisions, II, can be so read as to permit this." *Opinions of the Justices, post,* 781, 787.

The applicable canon of construction is well settled. Where the words to be interpreted are plain they are to be given their plain meaning. *Attorney General* v. *Methuen,* 236 Mass. 564, 572–573. *Yont* v. *Secretary of the Commonwealth,* 275 Mass. 365, 366–367. *Mount Washington* v. *Cook,* 288 Mass. 67, 70. *Opinion of the Justices,* 324 Mass. 746, 748–749. There is, we believe, no sufficient reason for not applying this well recognized rule in this case. When placed alongside the plain meaning of the sentence in question, the arguments directed toward proving that that sentence should not be given its plain meaning seem to the dissenting Justices weak and unconvincing. Such of these arguments as are based upon other provisions of art. 48 rely heavily upon the definitions at the beginning of that article. These definitions are necessarily expressed in general terms, which are developed and explained in the later portions of the article. We do not regard these definitions as in conflict with what we consider the plain meaning of General Provisions, II, Limitation on Signatures, but if there is conflict the latter provision is more definite and precise and, as it seems to us, must prevail over what has preceded it. Such of the arguments as refer to the supposed unfortunate consequences of the more literal interpretation rest upon convenience rather than upon necessity. Where the words of the Constitution are so clear as we conceive them to be in this instance, we can allow but little weight to interpretations heretofore placed upon them on various occasions by administrative officers. Courts should not allow the commands of the Constitution to be dis-

solved away by a process of administrative interpretation. Statements in our older cases bearing on this subject are still sound. *Portland Bank v. Apthorp,* 12 Mass. 252, 257. *Commonwealth v. Parker,* 2 Pick. 550, 557. *Pierce v. Drew,* 136 Mass. 75, 79. *McPherson v. Blacker,* 146 U. S. 1, 27. *Smiley v. Holm,* 285 U. S. 355, 369. *Neuberger v. Commissioner of Internal Revenue,* 311 U. S. 83, 88–89. See *Mugler v. Kansas,* 123 U. S. 623, 661, and cases collected in note to *Sanford's Estate v. Commissioner of Internal Revenue,* 84 Lawyers Ed. 43.

In our view the opinion goes beyond the proper function of construction or interpretation and amounts to an amendment to the Constitution. As was said in *United States v. Sprague,* 282 U. S. 716, at page 731, "The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition."