Fecteau, J.
This is an action brought pursuant to the provisions of G.L.c. 40A, §17, by which the plaintiffs challenge a July 9, 1991 decision of the Zoning Board of Appeals of the town of Spencer that granted a special permit to the defendant Gregg Andrews that allowed him to build a new hangar at the airport he owns and operates and which he had acquired from his grandfather. The plaintiffs complain that it is an improper expansion of a non-conforming use which has had a detrimental effect upon the surrounding residential area. Andrews, the successful applicant, contends that the permit was granted as accessoiy to a permitted use according to a prior version of the town zoning by-law and the permitted use is not significantly more detrimental to the neighborhood than that which existed prior to the construction of the new hangar. In addition, the defendant contends that the plaintiffs are precluded from litigation over this issue as they lack standing and as a result of a final decision of this court, Sosman, J., entered in 1995, concerning a related action brought by one or more of the same plaintiffs that involved a claim that runway changes made by the defendant Andrews caused an improper expansion of the use of the airport.
Trial of this case was conducted before me, without jury, on January 26-27, 2004.[1] The following findings of fact and rulings of law are made upon consideration of the credible evidence.
FINDINGS OF FACT
1. The plaintiffs: Scott Farrar and Ansley and Steven Siter reside, respectively, at 537 and 441 Marshall Street, Paxton, Ma.; Leonard Thibeault and Joseph and Claire Turgeon at 72 and 78 Thompson Pond Rd., Spencer, respectively. None of the plaintiffs *531 live on property contiguous to that of the airport in question. All are within a radius of approximately one-half mile from the northern end of the runway.
2. The defendant Gregg Andrews resides at 202 Paxton Road, Spencer.[2] He resides adjacent to and owns the Spencer Airport, located on 13 acres of land he acquired in approximately 1986 from a larger parcel owned by his grandfather Carl Andrews. The present business address of the airport is 204 Paxton Road. He became a licensed and certified airframe and power mechanic in May 1981, and a licensed and certified flight instructor in 1994. Prior to his acquisition and full-time employment in Spencer, he was employed as an airplane mechanic in Southbridge, Hartford and Worcester.
3. The remaining defendants are the Zoning Board of Appeals for the Town of Spencer and its members. After having conducted a hearing on June 25, 1991, the board issued, on July 9, 1991, its decision that approved the application of the defendant Gregg Andrews for a special permit to allow construction of a 60’ by 60’ airplane hangar at the Spencer Airport. This decision was filed with the Town Clerk on July 24, 1991, and this complaint was timely filed on August 12, 1991.
4. The airport is presently located in an R-45 zoning district which is a “Rural Residential” district; at the time of the application in question, the airport was subject to use regulations in accordance with Article 5.4 of the Spencer Zoning By-laws, as approved on August 15, 1985.
5. It is undisputed that the airport, beginning as early as 1946, pre-dated the first zoning by-law enacted by the town in 1965. According to this earlier by-law, an airport was one of several uses which “may be allowed, as a special exception, by the Board of Appeals after a public hearing and subject to appropriate regulations if determined to be neither offensive nor detrimental to the neighborhood.” Section IV, Part A(2)(a) of the Zoning By-laws of 1965 includes “cemetery, golf course, riding stable, marina or boat livery, ski area, airport or camp for children or adults.”
6. According to the zoning by-laws as enacted in 1985: “outdoor sports facility conducted for profit such as a golf course, country club, tennis club, marina, provided indoor or outdoor activities shall not be less than 100 feet from any property line and shall not be detrimental to the neighborhood” may be allowed by special permit in the R-45 district. Art. 5.4(B)(15).
7. According to the zoning by-laws, the Board of Appeals:
may grant special permits for certain uses or structures as specified in the Table of Use Regulations and elsewhere in this by-law. Before granting an application for a special permit, the Board of Appeals with due regard to the nature and condition of all adjacent structures and uses shall find all of the following conditions to be fulfilled:
11.1.1 The use is in harmony with the general purpose and intent of this by-law.
11.1.2 the proposed use will not create undue traffic congestion or unduly impair pedestrian safety.
11.1.3 the proposed use will not impair the integrity or character of the district or adjoining zones nor be detrimental to the health, safety or welfare.
8. During the years that preceded Gregg Andrew’s acquisition of the airport from his grandfather, the landing strip was a turf strip and there was a hangar/office building approximately 24’ by 60’ which could only accommodate a single airplane. From its beginnings in 1946 and through the 1950s, the airport was most often used by single engine aircraft which were usually of a size that would allow the entire airplane to fit inside this hangar. However, over time, and into the 1960s and 1970s, airplane design changed the average length so that a newer plane would usually not fit entirely inside the hangar, resulting in the tail section often extending outside the confines of the building. This older hangar was usually used for airplane maintenance and repair functions. Also located at the airport then, as now, were five “T-hangars,” each used for storage of a single airplane. There were other planes that were based at the airport but kept outside at “tie-down” sites.
9. In 1987, Gregg Andrews decided that, in order to improve the safely of the landing strip, which was turf up to that point in time, it should be “paved,” that perimeter lighting should be installed and trees cleared at the ends of the runway. He consulted with or applied to the town building inspector for his opinion as to whether such improvements would require a special permit and both the inspector and the Zoning Board of Appeals decided that a special permit was not required.[3] The plaintiffs Turgeon herein brought another action under G.L.c. 40A, §17, challenging these decisions. In addition, the plaintiffs complained therein that the paving of the runway resulted in a re-alignment of the runway causing the course of aircraft landing and taking-off to come directly over his house, located approximately 1500’ north of the north-south landing strip, whereas prior to the paving, the pilots seemingly had more discretion in their course.
10. In 1988, Andrews again decided that improvements were necessary to his operation, and filed for a building permit to construct a larger hangar. While the current appeal is in connection with a decision of the Zoning Board of Appeals issued on July 9, 1991, it came after a history that has been described by plaintiffs’ counsel as “tortured”; Andrews had first obtained a special permit for this construction in 1988 and which was completed during 1989.
*532 11.In June 1995, the “runway” case came on for trial before Sosman, J. of this court. For reasons that are not clear, that case was tried separately from the instant case, notwithstanding a similarity of issues and a reasonable likelihood of similar evidence. Among findings of fact made by the court at that time and which are deemed significant to this court in connection with the instant case are the following, with page references from Ex. 6, the transcribed findings of fact and rulings of Sosman, J.:
a. “Dating back to the forties, the airport provided general aviation services, fueling, maintenance, repairs, tie down of planes, some flight instructions, and varying times it also had a restaurant or snack bar.” (p. 2.)
b. “Over the years while it was a turf runway, there were about ten or more planes based there sometimes getting up as high as fifteen planes that remained tied down or the small circle on the ground.” (p. 4.)
c. “Plaintiff has also contended that the runway at the time it was paved was realigned. I find that that contention is simply not borne out by this record. The grass turf gave the pilot perhaps greater leeway on exactly what angle he would take off or land at, perhaps giving him a little more leeway. But the general direction of flight is the same. The paving of the runway simply means that obviously all pilots can stay on exactly that precise same direction. But there is no actual realignment. It remains running in basically a north, south direction, planes take off or land either north or south, into the wind. Which direction they go at present is simply a matter of weather.” (p. 7.)
d. “Since taking over the airport, Greg Andrews has engaged in activities to try to promote the use of the airport to build up the business. Prior to Greg Andrews’ acquisition, his grandfather ran the business but was suffering from declining health and the business correspondingly declined. At no point was it abandoned or terminated, but business had decreased notably during Carl Andrews’ ill health.” (p. 8-9.)
e. ‘There has been some increase in the volume of air traffic in and out of the Spencer Airport. It is difficult to calculate how much of that increase in volume is due to the actual improvements to the runway or the installation of night lights and how much is due to Greg Andrews’ increased promotion of the business.” (p. 9.)
f. “The number of planes actually based at the airport is the same. There are presently fourteen planes, . . . and that’s a figure that is very comparable to the numbers that were at the airport previously.” (p. 10.)
g. “The Worcester Airport, a far larger and more sophisticated airport in all respects, is only five
miles away. The Spencer Airport itself is on the very edge of the air space for the Worcester Airport. Circling planes, larger planes, plenty of air traffic can be observed in this vicinity of Spencer that has nothing whatsoever to do with the Spencer Airport.” (p. 11-12.)
h. “There is teaching going on at the Spencer Airport now as there used to be, but none of the teaching is done at night. I credit Mr. Andrews’ testimony that for purposes of training students, he takes them and has them practice at Worcester where the runway is substantially larger and longer and do not do night practicing or night training at Spencer itself.” (p. 13.)
i. “With regard to the type of aircraft. The court is satisfied on this record that the type of aircraft using the Spencer Airport has not changed as a result of the paving or the installation of the night lights. The airport is still used for small single engine aircraft with fixed landing gear. It is still by what is referred to as low performance aircraft. There has been an occasional landing by a twin engine plane.” (p. 14.)
j. “There has been servicing of the planes. The defendant Greg Andrews ... is highly skilled at repairing aircraft, used to work at the Worcester Airport. He has customers from his days at Worcester who have followed him to Spencer ... It appears that those planes are going there while seeking out the skill of Mr. Andrews, not his paved runway . . .” (p. 14.)
k. “Overwhelming it is the same small single engine planes using Spencer Airport that have used it dating all the way back to the forties.” (p. 15.)
12. Among reasons that Andrews wanted a larger hangar was that inspection, maintenance and repair of an airplane requires a certain minimum amount of time, with annual inspections and preventive maintenance usually requiring about 20 hours, up to approximately ten weeks if an engine needs an overhaul. Many of these more substantial jobs require parts to be ordered and with some of these jobs sent off-site; such projects often results in the engine being dismantled for a substantial period of time. While such work can physically be done outside, it is preferable that the dismantled airplane be inside, both for the protection of the airplane and for improved outward appearances, including noise reduction. A larger capacity hangar allows for some planes to be stored inside while receipt of ordered parts are awaited, and for the contemporaneous repair of other planes.
13. Andrews accounted that of his time spent on maintenance and repairs, 90% was for planes that were based at Spencer Airport. He estimates that there were approximately 15 planes based there in 1995, at the time of the “runway” trial, and he says that there are approximately 20 to 22 there at present, although admitting that the number of based planes has been *533 as high as 26. He attributes the increase in Spencer-based planes to the fact of his flight instruction, wherein new pilots will often have an interest in owning a plane; he estimates the current number of planes based at Spencer whose owners he taught to fly at 10. He himself owns a plane and leases a plane, both of which he stores at Spencer, one for flight instruction and the other for personal use. He says credibly that he would have become involved in flight instruction whether the new hangar had been built or not. He believes that his income from and time devoted to the maintenance and repair of airplanes, relative to the other sources of income from airport operations such as fuel sale, storage fees and flight instruction, has decreased over the time he has been operating the airport, and is minimal in comparison to flight instruction. Additionally, as in the trial of the “runway” case, use of the airport by twin-engine aircraft has been negligible.
DISCUSSION
This is an appeal by abutters who allege that they are aggrieved by a decision of the local zoning board of appeals in its grant of a special permit. “On appeal to the Superior Court, the judge is required to hear the matter de novo and determine the legal validity of the decision of the board upon the facts found by him .. . In making his findings, the judge is not allowed to give the board’s findings or decision evidentiary weight...” [Internal citations omitted.] Josephs v. Board of Appeals of Brookline, 362 Mass. 290, 295 (1972). Once the abutters have established their status as persons aggrieved, the burden of producing evidence and of persuasion to establish the validity of the grant of the variance or special permit is upon the party who obtained the permit, in this case, Gregg Andrews.
At issue in the case at bar is whether the use by Gregg Andrews, doing business as the Spencer Airport, of the premises located at 202 Paxton Road, Spencer, as improved by a larger hangar than was (and is) present and used up to 1989, constitutes a change or substantial extension of a prior, non-conforming use. There is no question that his use of the property, like that of his predecessor Carl Andrews, his grandfather, continues to be as a small airport. Moreover, its present use as an airport does not conform to a literal reading of the applicable zoning ordinance of the Town of Spencer, but that it was a permitted use under its predecessor by-law. By implication, there is a construction of the by-law that would allow for a reading that an airport is a permitted use.
The plaintiffs seek, in this action, to annul the decision of the Zoning Board of Appeals that affirmed the grant of a special permit for the construction of the hangar issued by the building inspector. The plaintiffs contend that Andrews’ construction and use of the hangar is either a change or a substantial extension of the prior non-conforming use to the detriment of the neighborhood. Andrews contends otherwise, saying that his use of the premises is permitted as merely a continuation, in kind and degree, of the pre-existing, non-conforming use. Moreover, he claims that this issue has been foreclosed by the decision in case no. 89-0940, under principles of collateral estoppel and/or issue preclusion, barring the re-litigation of this issue.
“A fundamental precept of common law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a ‘right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . .’ ” Fidler v. E.M. Parker Co., 394 Mass. 534, 539 (1985), quoting from Montana v. United States, 440 U.S. 147, 153 (1979). “Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation ... To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.” Montana, id,, at 153-54.
“Before applying collateral estoppel to preclude a party from re-litigating an issue, a court must answer affirmatively three questions: 1) was the issue decided in the prior adjudication identical with the one presented in the action in question; 2) was there a final judgment on the merits; and 3) was the party against whom the plea asserted a party or in privity with the party to the prior adjudication.” Massachusetts Property Insurance Underwriting Association v. Norrington, 395 Mass. 751 (1985). The purpose behind issue preclusion is to “conserve judicial resources, to prevent the unnecessary costs associated with multiple litigation and to ensure the finality of judgments.” Id, at 756. To hold that collateral estoppel applies, Massachusetts does not require mutuality of parties. Martin v. Ring, 401 Mass. 59, 61 (1987). When no mutuality of parties exists, the central inquiry is whether the issue on which preclusive effect is sought has been the “product of full litigation and careful decision.” Home Owners Federal Savings & Loan Association v. Northwestern Fire & Marine Insurance Co., 354 Mass. 448, 455 (1968). While the Turgeon plaintiffs and the defendant were the same as in the first trial, there are additional plaintiffs herein. However, while complete mutuality of the parties is not present, certainly the issues litigated, viz-a-viz, the contentions of the new plaintiffs shows that there is a sufficient similarity of interest between the first and second group of plaintiffs so that collateral estoppel may be applied to them. Moreover, in the cases of Corrigan v. *534 General Electric Company, 406 Mass. 478 (1990), and Fidler v. E.M. Parker Co., 394 Mass. 534 (1985), estoppel barred new claims of plaintiff spouses who were not parties to earlier proceedings involving their husbands on the basis that such claims were found to be “sufficiently related” and with no “other circumstances exist which warrant relitigation of the issues.” Id. 394 Mass, at 541-42, 548. Given that the specific and practical complaints that the plaintiffs expressed with the increased use of the airport and its resultant increase in noise and the risk of crash is so similar to those of the plaintiffs in the “runway” case, there is no real distinction to be drawn between the two cases as far as the impact upon the neighborhood is concerned. Moreover, when considered alongside the jurisdictional requirement of “standing” and the plaintiffs’ description of the alleged “legal harm” suffered by them as concerning the new airplane hangar, considered separately from the runway improvements, it becomes abundantly clear that the cases are “sufficiently related” and that “no other circumstances exist which warrant relitigation of the issues.”[4] None of the new plaintiffs have raised issues that were not raised by Turgeon in the first trial, nor are any such plaintiffs closer to the airport or more severely impacted by its operation than the Turgeons.
The 1995 decision by Sosman, J., which included several findings of fact pertinent here, followed a non-jury trial at which witnesses testified. This decision was not the subject of an appeal and now stands as a final judgment. While the complaint upon which the case tried before her referenced only the landing strip improvements and not the new hangar construction, the case was tried and her decision necessarily included a finding and holding that the total amount of increased use of the airport, for whatever reason, was not a change or a substantial extension of the use of the airport within the meaning of G.L.c. 40A, §6, some of which increased use she found attributable to the defendant’s reputation as an airplane mechanic. (Ex. 6, p. 14.)
G.L.c. 40A, sec. 6 provides, in pertinent part:
Except as hereinafter provided, a zoning ordinance . . . shall not apply to .. . uses lawfully in existence . . ., but shall apply to any change or substantial extension of such use . . . Pre-existing non-conforming . . . uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance . . . that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood.
The Zoning By-laws of the Town of Spencer contain a similar provision: “non-conforming buildings or uses may be extended, altered or changed, provided, that no such extension, alteration or change shall be permitted unless the Board of Appeals issues a special permit upon finding that such extension, alteration or change shall not be substantially more detrimental to the neighborhood than the existing non-conforming building or use.” Section 4.1.2
As noted by Sosman, J., in her decision, there is a three-part test to determine whether there has been a “change” or a “substantial extension”: (1) whether the current use reflects the nature and purpose of the prior use; (2) whether there is a difference in the quality or character, as well as degree, of use; and (3) whether the current use is different in kind in its effect on the neighborhood. Bridgewater v. Chuckran, 351 Mass. 20, 23 (1966). The property or business owner has the burden to show that the current use is sufficiently similar to the prior, lawful non-conforming use. Bridgewater, supra, at 24.
A non-conforming use may not only be continued but also increased in size. Cochran v. Roemer, 287 Mass. 500, 508 (1934). But a small existing nonconforming business cannot be so enlarged as to be different in kind in its effect upon the neighborhood. “The distinction is between an increase in the amount of business, even a great increase, which does not work a change in use, and an enlargement of a nonconforming business so as to be different in kind in its effect on the neighborhood.” Medford v. Marinucci Bros. & Co., Inc., 344 Mass. 50, 60 (1962). She found that the property owner, the defendant Andrews, had met his burden under this 3-part test, finding in particular that “the use is not different in kind in its effect on the neighborhood ... All that has happened here is a modest increase in the identical use, a modest increase in the hours of operation and modest safely improvements.” (Ex. 6, p. 21, 22.) Her decision is determinative of the instant case as well, as the very issues that were joined and tried in her case were joined and tried here, especially as concerned the third test: whether the current use is different in kind in its effect on the neighborhood.
Therefore, the Sosman decision precludes the plaintiffs herein from re-litigation of the issues and which requires, as a consequence, a finding for the defendant.[5]
ORDER FOR JUDGMENT
For the foregoing reasons, a judgment shall enter in favor of the defendants and the decision of the Zoning Board of Appeals of the Town of Spencer in its grant of the application of the defendant Gregg Andrews for a special permit for the construction of a hangar is AFFIRMED.

There was no explanation why this matter did not come up for trial sooner other than a claim that after the trial before Sosman, J., involving case no. 89-0940, there was a lack of interest.

At the time of his application for a special permit was filed with the Spencer Zoning Board of Appeals, he resided at 158 Paxton Road and the airport had an address of 202 Paxton Road.

The record herein does not include the record of any municipal actions taken on this application other than the findings and rulings of Sosman, J., on the plaintiffs’ appeal from the decision of the Board of Appeals in case no. 89-0940, ex. 6.

While the defendant contends that the plaintiffs lack standing, given the relative proximity of the Turgeons to the runway, that they are likely to be abutters to abutters and that their house is the closest to and on a relatively direct line with the runway, I find that they have standing. I also note that the defendant either did not challenge the standing of the Turgeons in the “runway" case, or that a finding of standing is implied in the decision of Sosman, J., thus preclusive against the defendant. So long as one plaintiff maintains standing, it is not necessary that others have standing. Murray v. Board of Appeals of Barnstable, 22 Mass.App.Ct. 473, 476 (fn. 7) (1986).

Assuming, arguendo, that this court’s decision as to the impact of collateral estoppel upon the plaintiffs’ complaint herein would not survive appellate review, I find that the defendant herein has met the 3-part test of Bridgewater v. Chuckran, supra as I do not find that the increased use of the airport amounts to a difference in kind upon the neighborhood. I find that any increased use, on account of the availability of a larger hangar, has been modest, only.