**EWING v. BRAUN et al.**

No. 17374.

Court of Appeal of Louisiana. Orleans.

June 13, 1940.

Dart & Dart and Louis C. Guidry, all of New Orleans, for appellant.

Robert G. Hughes, of New Orleans, for appellees.

WESTERFIELD, Judge.

Robert Ewing, Jr., a resident and property holder, seeks by injunctive process to restrain Dr. Otto Braun and his wife, Margaret Braun, from conducting a "Tourist Home" in the premises, owned by them, No. 6407 South Claiborne Avenue, this city, upon the ground that the operation of such a business in that locality is violative of the zoning ordinance No. 11,302 C.C.S., adopted by the Commission Council of the City of New Orleans on the 6th day of June, 1929, and will cause depreciation in the value of his property.

The defendants admit that they are the owners of the property described in relator's petition and that it is being used as a "Tourist Home" in that "transients are lodged therein without previous arrangement and for compensation", but they deny that they are violating any provision of the zoning ordinance because the building has always been used, since its erection in 1927, two years before the adoption of the ordinance, for the same purpose, and that under Section 10 of the ordinance, and its amendments, its continued use is permitted.

There was judgment below in favor of defendants dismissing relator's suit and he has appealed.

The zoning ordinance of the City of New Orleans divides the City into twelve districts designated as "A", "B", "C", "D", etc., and enumerates the several uses to which property may be put in the several districts. The defendants' home is situated in the "A" district where the conduct of a tourist home, boarding house or rooming house is not among the permitted uses. Section 10 of the zoning ordinance, as amended by Ordinance No. 13,749, C.C.S., adopted July 28th, 1932, reads in part as

follows: "(a) Existing Use of Land or Portion Thereof, be it further ordained, etc., that the lawful use of land, or portion thereof, existing at the time of passage of this ordinance, although such lawful, existing use does not conform to the provisions hereof, may be continued except as hereinafter provided in paragraphs (c) and (d), but if such nonconforming use is discontinued, prior to the time allowed in paragraphs (c) and (d), any future use of said land, or portion thereof, shall be in conformity with the regulations of the district in which it is situated."

Paragraphs (b), (c) and (d) and their qualifying provisions are not of interest since they do not affect this case. The sole question for decision, therefore, is whether the respondents were, prior to the adoption of the zoning ordinance, conducting the same business as they have since, so as to be exempt from the restrictions contained in the ordinance.

It is conceded by counsel for relator that for sometime prior to the enactment of the ordinance the defendants were in the business of "taking in of roomers of less than five in number".

Dr. and Mrs. Braun built the house No. 6407 S. Claiborne Avenue sometime in 1927 for the dual purpose of occupying it themselves and renting out rooms. They put a sign out with the word "rooms" on it. The rooms were rented without previous arrangement by the roomers, though at one time Mrs. Brown did have one permanent roomer. Mrs. Braun testified that roomers "rang my bell and asked me could I accommodate somebody; sometimes they are very nice; sometimes they asked me did I have a room I could spare a night or two nights; and I look at them and see they are desirable". She is corroborated in this respect by her husband, Dr. Braun, by her brother, D. C. Schwab, and by a Mr. Louis J. Greenberg, who stated that when he first came to New Orleans from Houston, Texas, in 1928, after having been absent from the City for twenty-one years, "I didn't know my bearings, and while riding up Claiborne Avenue, I noticed a sign 'rooms' and it was dusk, and I thought to stop that night until the next morning, and I drove over there and rang the bell and asked the lady if she had a room she could accommodate me". There is nothing in the record to contradict any of this evidence.

It is contended, however, that the business of renting rooms to transients differs materially from operating a "Tourist Home". Moreover, say counsel, the Brauns were not conducting any business of any kind prior to 1929, because the accommodation of less than five roomers, which is shown to be defendants' limit, was not a business prohibited by the ordinance, but was a use which is specifically permitted in the "A" residence district. We have examined Section 3 of the ordinance relative to the "A" residence district and can not find any permissive use of residences as rooming houses. As a matter of fact, no use of the property is permitted except such as is mentioned in the Section and there is no mention of "rooming houses" whether with five or more roomers. Section 4 relating to "B" residence districts authorizes the use of property for boarding and lodging houses. We find in Section 1 definitions of boarding houses and lodging houses:

"Lodging House. A building other than a hotel, containing not more than fifteen (15) sleeping rooms, where lodging for five or more persons, is provided for compensation pursuant to previous arrangements and not to any one who may apply."

"Boarding House. A building other than a hotel, containing not more than fifteen (15) sleeping rooms, where lodging and meals for five or more persons are provided for compensation pursuant to previous arrangement and not to any one who may apply."

The argument evidently is that since the defendants are shown by the record to have accommodations for not more than five people, they did not come within the definition of either a lodging or boarding house and that, therefore, by inference, the defendants are conducting no business at all and are simply occupying their property as a dwelling house as they are permitted to do in the most restricted area—that described in the ordinance as the "A" residence district. Whatever may be the force of this argument and whether the defendants were engaged in business or not prior to the adoption of the ordinance, the question still remains was the use of their property, subsequent to the enactment of the ordinance, the same as it was before the enactment, for they have not enlarged the premises and accommodate no more tourists now than they did roomers prior to 1929. They now call their establishment, however, a "Tourist Home" and have a sign to that effect, whereas previously they accommodated only roomers, but

neither the roomer nor the tourist made any previous arrangements for the use of the defendants' accommodations and the only distinction that we can draw is one without a difference so far as we can see—that between a roomer and a tourist. It is a well known fact, reflected by some of the evidence in the record, and of common knowledge, that the so-called "tourist home" is a matter of recent origin and development and, while in some sinister aspects, the tourist home may be said to present marked differences from the rooming or lodging house of earlier years, nevertheless, insofar as the defendants in this case are concerned, none of the objectionable features are claimed to be present, consequently, the only difference, which we can see, is in the name given the place and the wording of the sign which advertises it.

■ Counsel, however, say that the sign itself is a violation of the ordinance because, the only signs permitted in "A" residence districts are those provided for in paragraph 11 of Section 3 of the ordinance, which allows only a single sign four inches high and eighteen inches long, and that the defendants maintain several signs, some of which are of greater dimensions. The paragraph referred to authorizes "certain auxiliary uses customarily conducted in dwellings and homes, namely, the office of a physician, surgeon, dentist or other professional persons, provided no person shall engage in such professional occupation other than the members of the family who reside on the premises; * * * and provided further that no window or other display or sign is used to advertise such occupancy other than a single sign not more than four inches in height and eighteen inches in length". We can find nothing in this paragraph which relates to signs used by rooming houses nor is there anything to show that more signs were used to advertise the "Tourist Home" than were employed for that purpose in connection with the rooming house.

■ It is also contended that the respondents are violating the ordinance by permitting the parking of automobiles on their front lawn and counsel point to paragraph 9 of section 3 as authority for this contention. Turning to the section of the ordinance referred to, we find that it reads as follows: "Accessory Buildings, including one private garage (or in the case of a two (2) family dwelling, two (2) in-

dividual garages having a combined capacity not exceeding that of a private garage as herein defined). A private garage may exceed four (4) cars capacity, provided the area of the lot whereon such private garage is to be located shall contain not less than twelve hundred (1200) square feet for each vehicle stored. (see section 21, paragraphs (p), (q) and (r)."

A garage as defined in Section 1 of the Ordinance as amended by Ordinance No. 11,920 C.C.S., adopted January 28th, 1930, reads as follows: "Garage: A building or portion thereof, and/or any lot or lots of ground or piece or portion thereof used for the housing, temporary storage, parking, and/or care of self-propelled vehicles or trailers."

Section 21, paragraphs (p), (q) and (r) read as follows:

(p) "An Accessory Building or Buildings shall not be permitted in any required yard except the rear yard in which case accessory buildings not exceeding twelve (12) feet in height may occupy not more than thirty (30) percent of a required rear yard except as hereafter provided.

(q) "Accessory buildings, excluding stables, may be erected as a part of the main building where all yard regulations are complied with.

(r) "Accessory buildings shall be located as follows:—

"1. Not less than sixty (60) feet from the front lot line excepting the case of a lot fronting a street and abutting upon a park and/or public street and/or public open space in the rear, or vice versa, in which case such accessory building shall be located between the front and rear lines of the main building.

"2. Where an accessory building is located between the front and rear lines of the main building there shall be a minimum distance of three (3) feet between the accessory building and the nearest interior side lot line.

"3. On the street side of a corner lot an accessory building shall in no case be located less than ten (10) feet from the side street line and in the case of reversed frontage where the corner lot faces an intersecting street no accessory building shall project beyond the required front yard line of the building in the rear of such corner lot.

"Provided, further, that this regulation shall not be so interpreted as to reduce the

depth of an accessory building to less than eighteen (18) feet."

The argument is made that under this section a garage cannot be erected in the front yard and since a lot, on which automobiles are temporarily parked, is defined as a "garage", automobiles must be parked only in the rear yard. This is an ingenious argument, but we are convinced that a few automobiles on the front lawn does not constitute an "accessory building".

Our conclusion is that there is little or no difference, certainly none of a material character, in the business conducted by the defendants before the adoption of the ordinance in 1929, and that which they have operated since.

For the reasons assigned the judgment appealed from is affirmed.

Judgment affirmed.