LOUIS DEFELICE ET AL. *v.* ZONING BOARD OF APPEALS
OF THE TOWN OF EAST HAVEN ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued March 2—decided June 4, 1943.

*Joseph I. Sachs,* with whom were *Albert W. Cretella* and, on the brief, *Harry L. Edlin,* for the appellants (plaintiffs).

*Edward L. Reynolds,* for the appellee (named defendant).

BROWN, J.   The named plaintiff is owner of a twelve-acre tract of land in East Haven utilized as a commercial sand pit, and is president and principal stockholder of L. G. DeFelice & Son, Inc., the other plaintiff.   In May, 1941, the town's zoning and building inspector rejected the plaintiffs' application for a permit to install a sand classifier on this land, and the zoning board of appeals on July 15, 1941, denied their appeal from this ruling.   The plaintiffs appealed to the Court of Common Pleas which, because there was no adequate record of the board's proceedings, determined the facts upon extensive evidence produced by the parties (*Grady* v. *Katz,* 124 Conn. 525, 530, 1 Atl. [2d] 137), and dismissed the appeal.   The vital question upon the plaintiffs' appeal to this court is whether as a matter of law the erection and use of the wet sand classifier proposed constituted an extension of a nonconforming use in violation of the East Haven zoning ordinance.

The ordinance was adopted September 4, 1936.   The twelve-acre tract is located in an "A" residence zone as created thereby.   Admittedly, neither the use of premises for, nor the erection thereon of a structure to be used in the operation of, a commercial sand pit was included among the uses permissible in such a zone.   Section VII of the ordinance provides, how-

ever, subject to certain limitations not applicable in this case, that "any non-conforming use existing at the time of the passage of these regulations may be continued." The court's finding, though attacked, is subject to no material correction. It shows that Leroy R. Page was the owner of the land from 1928 until he sold it for $5400 to the plaintiff DeFelice on January 27, 1941; that prior to September 4, 1936, Page was extracting sand and loam from it for commercial purposes by the use of picks and shovels; and that, between that date and this plaintiff's purchase, large amounts of sand were sold from it, in the removal of which a steam shovel was utilized part of the time. The use of the twelve-acre tract for a commercial sand pit, as shown by these and other facts which it is unnecessary to recite, therefore constituted a non-conforming use at the time of the adoption of the ordinance which the finding indicates continued until the present controversy arose. The question is thus presented for determination whether the erection and utilization of the wet sand classifier would amount to an extension of this use.

This tract is a part of the original forty-acre Page farm bounded on the west by Maple Street and on the south by Rock Street. The whole tract is in the "A" residence zone referred to. While the whole farm was originally used exclusively for farming, as early as 1921, near its southwesterly corner, a sand pit was opened which has been operated commercially from time to time ever since. Prior to selling various tracts out of it, Page almost completely stripped and sold the loam from the entire farm, and from most of it had begun to sell gravel, fill and sand. This was not true of a ten-acre piece lying between the plaintiff's land and Maple Street which is still owned by Page, but on this he has been operating a sand pit for com-

mercial purposes since 1939. From 1934 to 1941 he sold off seven different tracts in addition to that sold to the plaintiff, and each of the purchasers has continued to operate sand pits thereon for commercial purposes and intends to continue so to do. The entire original tract is especially adapted by nature for sand pits, containing as it does excellent sand for commercial purposes, whether extracted by the wet or dry process. No wet sand classifier has ever been used on the property. Both before and since September 4, 1936, on portions of the original farm exclusive of the plaintiff's tract, equipment in constant use has consisted of hand shovels and other tools, steam and power shovels, one dry classifier, one asphalt plant, power cranes, horse-drawn vehicles, trucks, screens for sifting and grading sand and other types of sand-extracting equipment exclusive of a wet sand classifier.

In May, 1941, the zoning inspector, having observed the construction of several concrete footings on the plaintiff's tract to be utilized in the installation of the wet sand classifier, stopped the work, and it was then that the plaintiffs applied for the necessary building permit. The classifier is mostly of steel, one hundred and six feet long, eighty-five feet wide for a part of the distance, and forty feet high, with a floor area of two thousand square feet, and, exclusive of the float, the pump house which it supports, pipe, accessories and concrete footings, weighs forty-four thousand pounds. The equipment cost the plaintiffs in excess of $19,000. To operate the wet sand classifier, a body of water sufficient to sustain a float fifteen feet long by ten feet wide, with the Diesel suction dredge machinery and structure enclosing the same thereon, is essential. By this apparatus two thousand gallons of water and sand per minute are pumped into the classifier where, by the operation of a vibrating screen,

four cone-shaped tanks, troughs and a belt conveyor, the sand is washed and deposited in piles of assorted sizes, and the residue flows back into the wet pit. The pumping process excavates deep cavities in the pit and produces a pond of substantial depth, which constantly increases in size as the operation proceeds. This process is a substantial departure from the dry method of screening sand and, removing as it does all foreign substances, literally washes the sand. The resulting product is worth fifty cents per cubic yard more than sand extracted in its natural state. The plaintiffs' equipment is movable, not peculiarly adapted to use on this twelve-acre tract, and suitable for erection on any location. The plaintiffs purchased it as well as the land honestly believing that the wet sand classifier could be used in operating this property as a sand pit.

Old Foxon Road, which approximately parallels the general course of the north boundary of Page's remaining land and the plaintiff's land adjoining it on the east, is some three hundred feet north of the plaintiff's land. Directly across this road from the plaintiff's land a modern grammar school and a community house are located and this area is the center of community life. Surrounding these buildings are many one-family homes; there are also small farms in the immediate vicinity; and a church is located on the south side of the road to the east of the plaintiff's property. A small residential development exists north of Route 80, a main state highway which intersects Old Foxon Road on an acute angle from the northwest just east of the line of the plaintiff's easterly boundary. The general neighborhood is semi-rural and has excellent possibilities as an exclusive residential area.

The plaintiffs urge that the use of the wet sand

classifier involves no extension of the nonconforming use but rather is merely the substitution of a more modern and efficient apparatus and method for those formerly used. The defendants contend that it would be an extension, in that it not only includes the excavation of the sand but also its processing, and so would substitute a "sand factory" for the former process of excavation solely. In the ordinance quoted permitting the continuance of "any non-conforming use existing," as was pointed out by the court in considering a similar enactment in Pennsylvania, "neither the extent, quantity nor quality of the use is mentioned, but only that it must exist," and "neither the act, the ordinance nor the law generally requires the court to speculate as to the number of acts or business transactions necessary to constitute an existing use," but, "as understood in the ordinance, 'existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose." *Haller Baking Co.'s Appeal,* 295 Pa. 257, 261, 145 Atl. 77. As the court further suggested in that opinion, ordinarily this utilization for the conduct of a business in such a case as the one before us combines two factors: (1) the adaptability of the land for the purpose; (2) the employment of it within that purpose; and, as was also stated, the use need not be in actual operation at all when the regulations took effect. See *Darien* v. *Webb,* 115 Conn. 581, 586, 162 Atl. 690; *Lehmaier* v. *Wadsworth,* 122 Conn. 571, 576, 191 Atl. 539; *West Hartford* v. *Willetts,* 125 Conn. 266, 271, 5 Atl. (2d) 13; *State ex rel. Eramo* v. *Payne,* 127 Conn. 239, 241, 16 Atl. (2d) 286. Nor is it essential that as exercised it shall have utilized the entire tract. *Lamb* v. *A. D. McKee, Inc.,* 10 N. J. Misc. 649, 160 Atl. 563. Actual use as distinguished from merely contemplated use is requisite,

however. *West Bros. Brick Co.* v. *Alexandria*, 169 Va. 271, 284, 192 S. E. 881; *Chayt* v. *Zoning Appeals Board*, 177 Md. 426, 434, 9 Atl. (2d) 747. Under the definition in the *Haller* case the fact that improved and more efficient instrumentalities are utilized in pursuit of the use does not exclude it from the category of an "existing use," provided these are ordinarily and reasonably adapted to make that use available to the owner, and the original nature and purpose of the undertaking remain unchanged. The following cases are illustrative of this proposition: *Ewing* v. *Braun*, (La. App.) 196 So. 571; *Marcus* v. *Village of Mamaroneck*, 258 App. Div. 328, 330, 16 N.Y.S. (2d) 626; *North American Building & Loan Assn.* v. *New Brunswick*, 117 N. J. L. 63, 186 Atl. 727; *Cochran* v. *Roemer*, 287 Mass. 500, 192 N. E. 58, though this case is to be distinguished from the one before us because of a different provision in the ordinance there involved. In the following cases, where the nature and purpose were different from those of the original enterprise it was held that an extension of the "existing use" was involved: *Lexington* v. *Bean*, 272 Mass. 547, 552, 172 N. E. 867; *Burmore Co.* v. *Smith*, 124 N. J. L. 541, 547, 12 Atl. (2d) 353; *State* v. *Miller*, 206 Minn. 345, 350, 288 N. W. 713; *Matter of Eaton* v. *Sweeny*, 232 App. Div. 459, 462, 251 N. Y. S. 246; *People* v. *Giorgi*, 16 N. Y. S. (2d) 923, 924; *Coopersmith* v. *Murdock*, 262 App. Div. 1032, 30 N. Y. S. (2d) 317; *Bowen* v. *Hider*, 37 N. Y. S. (2d) 76, 83; and see *Chudnov* v. *Board of Appeals*, 113 Conn. 49, 55, 154 Atl. 161.

Within the principles of these decisions the plaintiffs are entitled to use power shovels and other such equipment in the removal of sand from the twelve-acre tract, pursuant to the exercise of their right to continue their nonconforming use of the land as a

source of supply for sand. This accords with the original nature and purpose of their use of the property. It is manifest, however, that the same may not hold true of the employment of the wet sand classifier, because of the difference already recited in structures, methods, objects and results involved. Whether or not it did presented a question for the board's determination, applying the principles referred to. This apparatus not only excavates and frees the sand of stones as does the dry screening method but washes and assorts it according to size, and thus produces a recognized commercial product of enhanced value. The board could properly have found that this constituted a departure from the original nature and purpose of the use and augmented the excavation previously conducted by a process of manufacture. "Zoning cannot be employed to prevent an owner taking earth products from his land. But if his sand pit or quarry is in a residence district he may be prevented from treating the product in that place." Bassett, Zoning, p. 215.

The court found that, located as proposed at the northerly end of the plaintiff's land in proximity to the grammar school, the wet sand classifier by its erection and operation would constitute an attraction to children, be unsightly in appearance, diminish the values of real estate in the neighborhood, produce a noise of splashing water and the rattling of screens and cones audible at a considerable distance and, should the plaintiffs' intentions be carried out, eventually convert the existing sand pit with its total area of ninety thousand square feet into a permanent deep pond or lake covering the entire twelve-acre tract. It is true that the elimination incident to the use of this process of the dust resulting from the excavation of sand by the dry method, and the plaintiffs' intent to

landscape the edges of the property to conceal the classifier and to fence it to keep out children and others attracted to it, might mitigate in some measure the harmful results referred to. However, in view of the residue of resulting disadvantage to the neighborhood and the public, plus the difference in structures, process and resulting product, we cannot under the authorities we have cited hold unwarranted the board's conclusion that the extension of a nonconforming use was involved. *Wilbur v. Newton*, 302 Mass. 38, 18 N. E. (2d) 365.

The controlling question which the trial court had to decide in this connection was whether the defendant board "acted arbitrarily or illegally, or so unreasonably as to have abused its discretion." *Piccolo v. West Haven*, 120 Conn. 449, 453, 181 Atl. 615; *Holley v. Sunderland*, 110 Conn. 80, 82, 147 Atl. 300. The same is true with relation to the plaintiffs' further claim that even if the use of the wet sand classifier would constitute an extension of the nonconforming use the board, under the power given it by § XV, 10 of the ordinance to "vary any requirement of these regulations in harmony with their general purpose and intent, so that substantial justice may be done," should have granted their application in view of the "practical difficulties and unnecessary hardships" involved. *First National Bank & Trust Co. v. Zoning Board of Appeals*, 126 Conn. 228, 237, 10 Atl. (2d) 691; *Blake v. Board of Appeals*, 117 Conn. 527, 532, 169 Atl. 195. The power to authorize such a variation is only granted for relief in specific and exceptional instances, and is to be sparingly exercised. *Grady v. Katz*, 124 Conn. 525, 529, 1 Atl. (2d) 137. The burden of proof to show that the board acted improperly was on the plaintiffs. *Perdue v. Zoning Board of Appeals*, 118 Conn. 174, 178, 171 Atl. 26.

Testing the trial court's judgment by these principles as applied to the record before us we conclude that it was correct.

One further claim of the plaintiffs is that, since § VII of the ordinance, in providing for the continuance of a nonconforming use, specifies in paragraph b. that "no non-conforming use shall be extended so as to diminish the extent of a conforming use," the use of the wet sand classifier cannot be held to violate the ordinance, in the absence of a finding by the court that any diminution of a conforming use was here involved. It is a sufficient answer to this contention that no such claim was made in the trial court. Practice Book, § 363; *Boardman* v. *Burlingame,* 123 Conn. 646, 655, 197 Atl. 761; *Woodstock* v. *The Retreat, Inc.,* 125 Conn. 52, 59, 3 Atl. (2d) 232.

There is no error.

In this opinion the other judges concurred.