[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This appeal is from the decision of the Zoning Board Of Appeals of the Town of Simsbury (ZBA) granting a variance for property owned by Aerospace Industries, Inc. (Aerospace), and leased to the Whale Group (Whale Group) under a lease/purchase agreement.[1]
The subject property, located on Tunxis Road in Tariffville adjacent to the Farmington River, is almost entirely in a Flood Plan zone, a small portion thereof being in an Industrial-2 (I-2) zone.[2] Standing on the land is an old mill which is currently used for offices and warehousing. The historic mill building has been in continual use as a manufacturing, warehouse, and office building since its construction in the 1860's; in 1964, Simsbury adopted regulations designating property contiguous to the river, below the 160th contour line, as a FP zone, thus rendering this property nonconforming.[3]
On November 30, 1989, Whale Group submitted the application[4] to the ZBA for a variance permitting it to: (1) alter the FP zone requirement on the subject piece to conform to the line requirements established by the Federal Emergency Management Agency (FEMA);[5] (2) utilize the property in accordance with certain uses permitted in an Industrial-1 (I-1) zone;[6] and, (3) make various renovations and improvements to the property, which would not extend beyond the present building footprint.
The public hearing on Whale Group's application was scheduled for December 20, 1989. Notice thereof was published on December 7th and 14th. On December 1, notices of the public hearing were mailed to the Town Clerks of the abutting municipalities, Bloomfield and East Granby, pursuant to General CT Page 9631 Statutes Section 8-7(b) and (e).[7] However, the notices sent to the two Towns incorrectly stated the date of the public hearing to be December 15, 1989, and failed to include the time and place of the public hearing.[8] In this appeal it is not disputed that plaintiffs, abutting land owners, received timely and proper notice.
At the December 20 public hearing, the applicants appeared with counsel. It was brought to the ZBA's attention that a prior owner had obtained a variance in 1984 for an addition to the existing building, and, that a previous application submitted by Whale Group requested a variance to allow uses permitted in an I-2 zone.[9] The ZBA was informed that when Simsbury zoning regulations were adopted, the property was designated I-1, and so remained until the FP (160th contour) was established in 1964, at which time it became nonconforming. Mr. MacNaughton contended that the FEMA line and the 160 elevation line "diverge tremendously" so as "to create this five acre parcel which is above the FEMA line where there is no danger, yet still below the town imposed 160th elevation", which he maintained was "unique to this parcel and create[d] a hardship". The applicant(s) asserted that "the fact that the floodplain line [was] inappropriate for this site and [the fact] that the building is so unique . . . constitutes a hardship. "
Applicants presented testimony by a representative of Landscape Architects (LADA) explaining the floodplain and FEMA lines in detail (referring to a prepared map). Further information was presented pertaining to the 50, 100, 500 year flood factors and it was stressed, repeatedly, that flood levels have been reduced over the years due to the construction of flood control dams, etc., since the 1955 floods. Counsel for the applicant presented petitions containing about 300 signatures from persons favoring the proposal, as well as several letters in support thereof. The petitions and letters referred to the "Rivermill" restoration as "an office, restaurant, and health fitness facility". The petitions stated that the signatories "felt strongly that this renovation [would] help restore the economic vitality of the Tariffville section . . as well as preserve and put to best use an obsolete but historic building". One writer observed: "[t]he approval for the structure's use in the I-1 zone can only be a positive step and one which should be appreciated by the community[;] [t]he trade-off if the building is not renovated and left to decay has no rational merit."
The applicant(s), describing themselves as "real estate developers and builders", told the ZBA that they were requesting they be allowed to use the site for all of the I-1 permitted uses, including a health/fitness facility and a CT Page 9632 restaurant; counsel advised that if the variance was granted, site plan approval would then be required from the Zoning Commission. The ZBA was advised by Mr. MacNaughton that "[u]nless we can bring this building into compliance with the zoning and upgrade it so that we can make it marketable property, it's very hard to justify the dollars, spending the dollars on the property that are needed to make it so that it can function into the future." There was extensive discussion regarding why the applicant considered it a hardship to continue with utilization of the site in accordance with the uses permitted as a result of its present nonconforming status.[10]
Also discussed was whether the variance as requested (all uses permitted in the I-1 zone) was tantamount to a request for a change of zone with respect to this location, a matter which would properly be before the Zoning Commission.[11]
The applicants presented a traffic engineer who provided a summary of traffic at the intersection of Route 189 and One Tunxis Road; there was discussion of a widening of Route 189, and a suggested second, coordinating traffic light intended to control traffic exiting from Tunxis Avenue. A letter in opposition to the applications, signed by about ten residents of Tunxis Road was received into the record, together with supporting documentation. One such resident, speaking in opposition, told the ZBA of concerns regarding traffic at the intersection and excessive parking proposed for the site. Another resident of Tunxis Road voiced strong opposition to the presence of a restaurant on the old mill site. Communications received by the ZBA from the Planning Commission and from the Zoning Commission were read into the record. In its memorandum dated 12/18/89, the Planning Commission acknowledged that "it is the decision of the ZBA to determine the floodplain line for this particular site with appropriate evidence of hardship", recommended that the 160 contour line continue to define the limits of the floodplain zone for the site, and stated that it would have "applicant(s) pursue [a] proposed use of the property through the Zoning Commission and the process for special exceptions." The Zoning Commission's letter referred to the ZBA's authority under Article Twelve, Section A3 of the Regulations.[12]
Following the presentation, the ZBA engaged in extended discussion regarding the desirability of the proposal. Generally, the Board viewed the proposed renovation of the historic mill as "desirable", an "attractive project", and one that would enhance the general area; much of the discussion concerned specifying the uses to be permitted by variance, the ZBA membership finally deciding to limit the wording to "`offices and whatever other uses are . . . subject to zoning commission approval for special exceptions -'". The variance CT Page 9633 actually granted was worded as follows:
 "A variance in Article Seven, Section M, of the Simsbury Zoning Regulations . . . to permit the use of the premises for office purposes permitted in an I-1 Zone, to permit Special Exception uses permitted in an I-1 zone subject to zoning commission approval for Special Exceptions in an I-1 Zone, and to permit renovation of the existing building and construction of site improvements on the premises as shown on the plans submitted.
 . . . the fact that the existing structure predates the zoning regulations constituted a hardship and relief can be granted without detriment to the public welfare and impairment to the integrity of the Simsbury Zoning Regulations."
Following publication on December 28, 1989 of the ZBA decision, plaintiff's, as abutting owners, filed the instant appeal; three grounds are now pressed: (1) the notices provided to the contiguous municipalities were defective and deprived the ZBA of jurisdiction to hear the applicant and grant the variance; (2) the applicants failed to establish exceptional difficulty or unusual hardship justifying a variance of the zoning regulation; and, (3) the granting of the variance effectively constituted a de facto change of zone.
I. Jurisdiction
A. Aggrievement
Aggrievement is a prerequisite to an appeal from the decision of a zoning authority. Smith vs. Planning Zoning Board, 203 Conn. 317, 321 (1987). General Statutes Section8-8(a) provides that "[a]ny person . . . aggrieved by any decision of . . [the] board, or any person owning land which abuts or is within a radius of one hundred feet of any portion of the land involved in any decision of . . [the] board . . . may, within fifteen days from the date when notice of such decision was published in a newspaper . . . take an appeal to the superior court. . ." A plaintiff must plead and prove aggrievement. Fuller v. Planning and Zoning Commission, 21 Conn. App. 340, 343
(1990). Both plaintiffs have alleged that they are aggrieved by the granting of the variance.
The court finds that the plaintiffs have established statutory aggrievement.[13]
CT Page 9634
B. Timeliness
Notice of the ZBA decision was published in the Farmington Valley Herald on December 28, 1989. The court has reviewed the Return of Service as well as the entries in the official court file. The parties agree, and the court finds, that this appeal is timely.
II. Scope Of Review
The court's appropriate function on an appeal from the action taken by a local zoning authority is simply to determine whether the authority acted arbitrarily, illegally, or in abuse of its administrative discretion. Whittaker v. Zoning Board of Appeals, 179 Conn. 650, 654 (1980); Beit Huvarah v. Zoning Board of Appeals, 177 Conn. 440, 444 (1979); Miclon v. Zoning Board of Appeals, 165 Conn. 749, 752 (1974); Tazza v. Planning and Zoning Commission, 164 Conn. 187, 191 (1972). A reviewing court is to consider the entire record before the Board and determine whether it "has acted fairly, with proper motives, and upon valid reasons." Willard v. Zoning Board of Appeals, 152 Conn. 247,248-49 (1964). The appropriate role of the court is simply to ascertain whether the administrative record reasonably supports the conclusion reached by the agency. Burnham v. Planning and Zoning Commission, 189 Conn. 261, 265 (1983). Determinations of local boards should not be overturned unless it is found they have acted unfairly, without proper motives, and upon invalid reasons; Devaney v. Zoning Board of Appeals,143 Conn. 322, 325 (1956); Mallory v. West Hartford, 138 Conn. 497,505 (1952); and, where it appears that an honest judgment has been reasonably and fairly exercised after a full hearing, courts should be cautious about disturbing the decision of a local board. Whittaker v. Zoning Board of Appeals, supra; Kutcher v. Town Planning Commission, 138 Conn. 705, 710 (1952). Courts are not to substitute their judgment for that of the board members. Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, 572-73 (1988); Whittaker v. Zoning Board of Appeals, supra at p. 654; Horvath v. Zoning Board of Appeals, 163 Conn. 609 (1972). Where the Board has stated the reason for its decision, the court should consider whether the assigned ground is reasonably supported by the administrative record, and whether the ground is pertinent to the considerations the zoning authority was required to apply under the regulations; the Board's action is to be sustained if the stated reason is sufficient to support it. Fedorich v. Zoning Board of Appeals, 178 Conn. 610, 613-14 (1979); Beit Havurah v. Zoning Board of Appeals, supra at p. 444-45; DeMaria v. Planning and Zoning Commission, 159 Conn. 534, 540 (1970). The Board's determination is to be upheld if its stated reason supports it; CT Page 9635 Hoagland v. Zoning Board of Appeals, 1 Conn. App. 285, 290
(1984); the burden rests with the plaintiffs to establish that the Board acted improperly or illegally. Whittaker v. Zoning Board of Appeals, supra at p. 654.
III. Merits
A. Notice To Adjacent Communities
Plaintiffs argue that the notice to the abutting municipalities of Bloomfield and East Granby failed to meet the requirements of General Statutes Section 8-7b in that the hearing date was incorrectly stated (December 15, 1989), and the required time and place of the public hearing were omitted from the notice. Section 8-7b, entitled "Notice to contiguous municipalities of variance applications," provides: "Whenever a zoning board of appeals has before it for consideration an application for a variance in the use of property any portion of which lies within five hundred feet of a contiguous municipality within the state, such board shall, at least one week prior to the hearing thereon, notify the clerk of such municipality, in writing, of the fact of such application and of the date, time and place fixed by it for such hearing."
The ZBA argues that notice of the hearing was published in the newspaper (December 7 and December 14, 1989) and that it notified the clerks of the abutting towns of the pendency of the applications, as well as providing them with copies of the application for variance. Further, that since the misstated date was prior to the actual date of the meeting, and as the towns did not object to, comment on, or attempt to intervene, the notice provided to the abutting municipalities was sufficient, and there was no resulting prejudice to the rights of these plaintiffs', or to the abutting towns. Defendants stress that the neighboring towns received actual notice in ample time to review plaintiffs' applications; they argue, alternatively, that even if the notice to the abutting towns was inadequate, these plaintiffs were not prejudiced thereby, and, plaintiffs' rights to object to the applications, or to appeal the ZBA decision, were in no way impaired by the notice. Plaintiffs, of course, contend that the ZBA's failure to comply with the precise statutory requirements regarding notice to abutting towns deprived the ZBA of jurisdiction to hear and decide the variance application(s).
Our Supreme Court has stated, repeatedly, that the purpose of the notice requirements in zoning statutes is to assure that those who would be affected by the zoning authority's action are "fairly and sufficiently apprised of the nature and character of the proposed action so as to enable them CT Page 9636 to prepare intelligently for the hearing . . ." Dupont v. Planning and Zoning Commission, 156 Conn. 213, 218 (1968); see also: Danseyar v. Zoning Board of Appeals, 164 Conn. 325, 330
(1973), quoting Shrobar v. Jensen, 158 Conn. 202, 207 (1969). Plaintiffs rely, primarily, on Cocivi v. Planning and Zoning Commission, 20 Conn. App. 705 (1990); that case involved newspaper publication pursuant to General Statutes Sections 8-3a
and 8-3c(b); the legal advertisement contained a correct date in the notice heading, but set forth a date several months prior thereto in the text of the notice. The Appellate Court stated:
 "We cannot agree that this notice, defective as to the announced date of the public hearing, satisfied the statutory notice requirements. Those requirements are for the protection of property interests and therefore implicate rights of due process. . . Our courts have consistently refused to consider the adequacy of public notice to be a merely procedural matter and have unwaveringly treated failure to give proper public notice as a jurisdictional defect . . . Compliance with the notice procedures requiring that the time of a scheduled public hearing be published at least twice, is a prerequisite to valid zoning authority actions . . . .Without proper public notice, zoning authority actions are null and void. (Emphasis added) id. at p. 707-08.
As is apparent from the above, Cocivi addressed issues of public notice, while the instant case involves a defective notice to abutting municipalities.
Here the towns did receive notice (and copies) of plaintiffs' applications; the record discloses that the written notices were mailed (and were received) by the abutting towns some nineteen days before the actual hearing and fourteen days prior to the incorrect hearing date. There is no claim that the public notice of the hearing was inadequate, or that any rights of members of the public to prepare for, appear, and be heard at the hearing were in any way abridged. Thus, with respect to the public, there is no issue here, as there was in Cocivi, directly affecting, or impacting on, individual property interests and/or implicating fundamental due process rights. Also, in contrast to Cocivi, the notice in issue here contained an incorrect future date, not a date long since past; had representatives of either town appeared for, or inquired CT Page 9637 regarding, a hearing on December 15, 1989, they would have been advised that the hearing was to be held on December 20, and informed of the precise location. Significantly, both towns received Whale Group's applications well in advance of both the incorrect and correct hearing dates, were put on notice of the substance of those applications, and that a hearing thereon would be held; with such information, and with the advance time, there existed ample opportunity for the abutting towns to inquire regarding plaintiffs' applications, and, if they wished to oppose or be heard on same, to obtain clarification regarding any misinformation or lack of information as to the correct date and place. The abutting towns, of course, never opposed these applications and have not, at any time, sought to intervene. And, as stated, there is no claim here that the public notice, or notice to the plaintiffs themselves, as abutting landowners, was defective or inadequate. Considering all of the attendant circumstances, the defective notice to the contiguous towns should not operate, in the context of this appeal, to render the ZBA action null and void, particularly since it is not those towns who are contesting the granting of the variance, and as the notice provided to the plaintiffs themselves was entirely appropriate. See, e.g.: Slagle v. Zoning Board of Appeals,144 Conn. 690, 693 (1957) ("reasonable time for notification . . . is dependent on the circumstances surrounding the particular transaction"); Smith, et al. v. Zoning Board of Appeals of The City of Ansonia, et al., 5 CSCR 577 (1990) (the plaintiff received no official notice of hearing, but appeared and participated; under "all the surrounding circumstances, . . court cannot find that the Board lacked jurisdiction . . . based on inadequate notice to the plaintiff.")
It is recognized that "due notice to interested parties of a hearing to be held by a zoning board is necessary to its jurisdiction." Bencivenga v. Zoning Board of Appeals,2 Conn. App. 384, 387 (1984) (where record failed to reflect that any notice was given to the plaintiff, who was the owner of the property actually affected by the zoning board's decision). And, a defect in a notice may not be misleading. Cavallaro v. Durham,190 Conn. 746 (1983) (involving public notice). However, all defects are not jurisdictionally fatal. Cavallaro v. Durham, supra ("if a proper notice is published according to law, the commission is not precluded from holding a hearing and taking appropriate action merely because another notice may have been defective"); Welles v. East Windsor, 185 Conn. 556, 559 (1981) (notice need not describe proposed action in detail or with exactitude); Brazo v. Real Estate Commission, 177 Conn. 515
(1979) (sufficiency of content of notice to inform of precise misconduct charges and to permit preparation of defense). The fundamental purpose of notice requirements is to apprise of the nature and character of the proposed action, enable those CT Page 9638 affected to prepare intelligently, and to allow those interested to be heard, Bombero v. Planning and Zoning Commission, 17 Conn. App. 150,154 (1988); Smith, et al. v. Zoning Board of Appeals of the City of Ansonia, supra. Here, the abutting towns had notice of the substance and content of Whale Group's applications; certainly, these plaintiffs had timely and correct notice of the hearing on Whale Group's applications, and they were in no way prejudiced by the defective notice to the adjoining towns.
The court agrees with defendants: that since the notice which was defective was intended for the benefit of the contiguous towns, and as these plaintiffs received timely and correct notice, and as the plaintiffs were in no manner prejudiced by any defect in the notice to the adjoining towns, the defect should not serve to invalidate a zoning action which has never been contested by the recipient(s) of the defective notice(s). As stated, this case does not involve a defective public notice (as did Cocivi); and, in Ilvento v. Frattali,210 Conn. 432, 434 (1989), our Supreme Court, while discussing General Statutes Section 8-28(a) (appeal from Planning Commission decision), acknowledged that the "legislature . . . clearly expressed an intention that appeals from the decisions of planning and zoning commissions be heard and decided on their merits and not be invalidated for technical defects in service." The court concludes that the defective notice to the abutting towns in this case did not deprive the ZBA of jurisdiction to conduct a hearing on the Whale Group's application(s).
B. Variance: Exceptional Difficulty or Unusual Hardship
Proof of hardship is a condition precedent to the granting of a variance. Point O'Woods Ass'n vs. Zoning Board of Appeals, 178 Conn. 364, 365 (1979). Plaintiffs argue that the variance granted to the defendant Whale Group is either a change of zone or an expansion of a nonconforming use, and that the only hardship suffered by defendants is financial distress.
Our Supreme Court has stated repeatedly that the power to vary the application of zoning regulations should be exercised sparingly. Carlson v. Zoning Board of Appeals,152 Conn. 657, 661-662 (1965). By its very nature, a variance is granted with respect to a particular piece of property and can be enjoyed not only by the present owner, but by all subsequent owners; thus, a variance is not a personal exemption from the enforcement of a zoning regulation, but, is a legal status granted to a certain parcel of realty without regard to ownership. Garibaldi v. Zoning Board of Appeals, 165 Conn. 235,239 (1972). Therefore, it is firmly established that financial loss, or the potential of financial advantage to the applicant(s), CT Page 9639 is not a proper basis for the granting of a variance. Garibaldi v. Zoning Board of Appeals, supra; Carlson v. Zoning Board of Appeals, supra at p. 89. The Connecticut Supreme Court had declared, repeatedly, that a zoning board of appeals should state the reasons for its actions rather than cast upon the court "the burden of searching the record in an attempt to find some basis for the action taken." Carini v. Zoning Board of Appeals, 164 Conn. 169,171 (1972).
One who seeks a variance of an existing zoning regulation must shown that because of some unusual characteristic of his property, a literal enforcement of the zoning requirement would result in an unusual hardship to him. Belknap v. Zoning Board of Appeals, 155 Conn. 380, 383 (1967). The hardship must be different in kind from that "generally affecting properties in the same zoning district, and must arise from circumstances or conditions beyond the control of the property owner." Whittaker v. Zoning Board of Appeals, supra at p. 657; Smith v. Zoning Board of Appeals, infra at p. 327. "Where the hardship involved `arises as the result of a voluntary act by one other than the one whom the variance will benefit, the board may, in the sound exercise of its liberal discretion, grant the variance.'" (Emphasis added). Whittaker v. Zoning Board of Appeals, supra at p. 658. The hardship "must be one that originates in the zoning ordinance . . . and arises directly out of the application of the ordinance to circumstances or conditions beyond the control of the party involved." (Emphasis added) Whittaker v. Zoning Board of Appeals, supra at p. 658. "Where the claimed hardship arises from the applicant's voluntary act, a zoning board lacks power to grant a variance." Johnny Cake, Inc. v. Zoning Board of Appeals, 180 Conn. 296, 300
(1980); Whittaker v. Zoning Board of Appeals, supra at p. 658; Abel v. Zoning Board of Appeals, 172 Conn. 286, 289 (1977). "It is well settled that `self-inflicted or self-created hardship . . . is never considered proper grounds for a variance.'" Abel v. Zoning Board of Appeals, supra. Clearly, economic advantage to the owners of land, or the loss thereof, does not establish legal hardship which permits the granting of a variance. Laurel Beach Assn. v. Zoning Board of Appeals, 166 Conn. 385,387 (1974).
As stated, "[p]roof of economic advantage to the owners of the property is not proof of legal hardship which supports the granting of a variance." Laurel Beach Assn. v. Zoning Board of Appeals, supra.
 ""Financial considerations are relevant only in those exceptional situations where a board could reasonably find that the application of the regulations to the property greatly CT Page 9640 decreases or practically destroys its value for any of the uses to which it could reasonably be put and where the regulations, as applied, bear so little relationship to the purposes of zoning that, as to particular premises, the regulations have a confiscatory or arbitrary effect."
 Grillo v. Zoning Board of Appeals, 206 Conn. 362, 369-70 (1980).
Plaintiffs here argue that the restrictions on the property were known to Whale Group at the time of the lease/purchase agreement and, accordingly, were fairly reflected in the negotiated purchase price. However, the Supreme Court has stated:
 "If the hardship is created by the enactment of a zoning ordinance and the owner of the parcel could have sought a variance, then the purchaser has the same right to seek a variance and, if his request is supported in law, to obtain the variance. Otherwise the zoning ordinance could be unjust and confiscatory."
 Adolphson v. Zoning Board of Appeals 205 Conn. 703, 712-13 (1988).
Nevertheless, as stated, it is "well settled that the hardship must be different in kind from that generally affecting properties in the same zoning district . . ."' Grillo v. Zoning Board of Appeals, supra at p. 373; and, it must arise "from circumstances or conditions beyond the control of the property owner." Smith v. Zoning Board of Appeals, 174 Conn. 323, 326
(1978).
In granting a variance, the zoning authority is presumed to have acted fairly and for valid reasons. Burlington v. Jencik, 168 Conn. 506, 508-09 (1975). The burden of establishing that the ZBA improperly granted the variance is on plaintiffs. DeFelice v. Zoning Board of Appeals, 130 Conn. 156,164 (1943). As stated, the role of the reviewing court is simply to determine if the record reasonably supports the conclusion reached by the administrative body. Burhnam v. Planning and Zoning Commission, supra.
General Statutes Section 8-6 vests in the ZBA the authority "to determine and vary the application of the zoning . . . regulations in harmony with their general purpose and intent and with due consideration for conserving the public health, CT Page 9641 safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such . . . regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety secured . . ."[14] "Thus, where the "literal enforcement of . . . [the] regulations would result in exceptional difficulty or unusual hardship", the ZBA has the power to grant a variance; however, two conditions must be satisfied: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning regulation must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan. Adolphson v. Zoning Board of Appeals, supra at p. 709; Whittaker v. Zoning Board of Appeals, supra at p. 655; Aitken v. Zoning Board of Appeals, 18 Conn. App. 195, 204
(1989). To uphold a variance, the reviewing court must find evidence of hardship and compliance with the two part-test for a variance. Smith v. Zoning Board of Appeals, supra.
Plaintiffs first contend that any hardship in this case is self-imposed; that is, the subject property was knowingly purchased as nonconforming, and that circumstance was reflected in the purchase price. In 1964, Simsbury established the FP zone; prior to that time the property had been in the I-1 district. In 1985, the present owners purchased the site with knowledge of the nonconformity; simply put, the circumstance of the nonconformity ran with the land and did not constitute a self-inflicted hardship which would, in and of itself, militate against the granting of the variance application. If the applicant or his predecessor in title created the nonconformity, the ZBA would not have the authority to grant a variance. Adolphson v. Zoning Board of Appeals, supra; Abel v. Zoning Board of Appeals, 172 Conn. 286 (1977). But, if a particular hardship results from the enactment of a zoning regulation, "and the owner of the parcel could have sought a variance, then the purchaser has the same right . . ." Adolphson v. Zoning Board of Appeals, supra. "`Where a nonconformity exists, it is a vested right which adheres to the land itself;'" here, the circumstance of the nonconforming use ran with the land to the purchasers, it resulted from the application of the regulation to the property, and it was not a circumstance created by the title holders. Id. at p. 712-13.
The reasons stated by the ZBA in granting this variance are attacked by plaintiffs as being legally unsound and devoid of support in the administrative record. As its reason, the ZBA stated: "the fact that the existing structure predates the regulations constituted a hardship and relief can be granted CT Page 9642 without detriment to the public welfare and impairment to the integrity of the Simsbury Regulations." The issue thus presented is whether those reasons assigned by the ZBA for the granting of the variance are reasonably supported by the record and are pertinent considerations under the General Statutes and the Simsbury Ordinance. See: Chevron Oil Co. v. Zoning Board of Appeals, 170 Conn. 146, 152-53 (1976). Where a zoning authority has formally stated the reasons for its decision, a reviewing court generally should not go behind that official statement. Chevron Oil Co. v. Zoning Board of Appeals, supra at p. 153; DeMaria v. Planning Zoning Commission, 159 Conn. 534,541 (1970). "If the board fails to give the reasons for its actions, or if its reasons are inadequate, the trial court must search the record to determine whether a basis exists for the action taken." Stankiewicz v. Zoning Board of Appeals, supra at p. 732.
"An applicant for a variance must show that, because of some peculiar characteristic of his property, the strict application of the zoning regulation produces an unusual hardship as opposed to the general impact which the regulation has on other properties in the zone." Berlani v. Zoning Board of Appeals, 160 Conn. 166, 170 (1970). Before this court, defendants argued that there had been demonstrated two incidents of unusual hardship: "The hardship of being a pre-existing, nonconforming use"; and the "hardship established by expert testimony . . that the flood-plain line as established on this particular property was grossly unfair and inappropriate on this . . site." As stated, the finding articulated by the ZBA makes no specific reference to the latter claim of hardship. Regarding the former ("pre-existing, non-conforming use"), defendants' brief simply reviews the history of the property, citing no legal authority for the proposition that the mere circumstance of nonconformity, that is, the fact that the existing structure predated the regulations, constitutes "exceptional difficulty or unusual hardship" sufficient for the granting of a variance.[15]
The contention that an unusual hardship exists merely because "the existing structure predates the zoning regulations" is untenable, particularly when it is considered that building had the same actual use both before and after the 1964 FP enactment: i.e. manufacturing and warehousing. The structure was used for such purposes initially in the I-1 zone, and thereafter, as a nonconformity, in the post 1964 FP zone; thus, the application of the FP regulation to the property did not result in any undue hardship merely because the building predated the regulation(s). The court concludes that the hardship finding specifically stated by the ZBA is inadequate to support the granting of this variance.[16]
Aside from the ZBA's specifically articulated finding CT Page 9643 of hardship, defendants refer the court to record evidence presented to the Board relating to flood hazard lines and the projected incidence of flooding at this location. Defendants also refer to the express finding set forth in the text of the 1984 variance allowing the construction of a five thousand square foot addition to the building; the 2/21/84 variance read: ". . . special circumstances, specifically the location of the existing building built prior to adoption of Zoning Regulations, and the evidence submitted at the hearing relating to flood levels, constitute a hardship . . ." (Emphasis added). Dealing first with the relevance of the 1984 variance, and its express finding regarding flood levels, it seems clear that a finding made some four years before, by a different Board, cannot be viewed as a basis for the 1989 variance which is the subject of this appeal. In fact, that was precisely the position of the ZBA when applicant's counsel spoke regarding "your 84 decision;" the ZBA chairman responded: "Let me point out . . that any previous decisions by the Board [are] not precedent setting and each application is taken on its own merits." Before this court, plaintiffs argued, persuasively, that "the only relevance of [the 1984] . . variance is that no one appealed."
With respect to the evidence concerning flood lines and levels presented at the public hearing (12/20/89) on the instant variance, it consisted of statements by applicants' counsel and applicants, and the testimony of Mr. Selger and Mr. Hesketh, both of LADA. The substance of the defendants' contention before the Board was that the FP line (160) was "inappropriate", that the FEMA line was perfectly adequate to protect the public health and safety at the location of this property, and, in 1964, following the extensive damage caused by the 1955 flood, the Zoning Commission, in enacting the FP Zone regulation, "arbitrarily" applied the 160 contour line to all land bordering the Farmington River without regard to slope, elevation, and other physical characteristics of individual parcels. The essence of the expert testimony (Mr. Selger and Mr. Hesketh) was that the FEMA line, established for flood insurance purposes, provided a fairer and more sensible line at the Tuxis Road area, fully compatible with the public safety, considering the realistic incidence of flooding, the significant flood control projects that have been completed since the 1955 floods, and the elevation of the 5.5 acre tract. Specifically, the evidence was that at this location, the FP line (160) and the FEMA line diverged greatly (FEMA line — 148) due to the slope and elevation of this land, thereby resulting in almost this entire tract being below the 160th contour, but yet above the FEMA-148 line. Because of the slope and elevation of this land, and the corresponding divergence of the FP and FEMA lines at this location, and expert testimony regarding flood levels CT Page 9644 and the projected incidence of serious flooding, defendants maintained that application of the FP regulation to this property results in "exceptional difficulty or unusual hardship", different from the general impact the regulation has on other properties in the FP zone.[17] Defendants' counsel argued before the ZBA, based on the testimony, as follows:
 "The FEMA line and the 160 elevation line diverge tremendously creating a 5 acre parcel which is above the FEMA line where there is no danger, yet still below the town imposed 160 ft. elevation. This . . is unique to this parcel and creates a hardship . . . this does not happen anywhere else in town."
In essence, defendants' claim was, and is, that due to the size, elevation, and contour of this particular property, the application of the FP regulation to it results in unusual hardship.[18]
The court recognizes that it is not to substitute its judgment for that of the ZBA, and that the weight to be given evidence before it, and all assessments regarding the credibility of witnesses, are clearly matters entirely within the province of the Board. In this case, it thus becomes the the sole function of the court to determine if the testimony presented to the ZBA, assuming it was accepted and given weight by the Board,[19] provided a basis for the granting of this variance. It is the court's view that it did not. All other parcels along the Farmington River, in the F.P. zone, must also live with the two lines and, as the presentation before the ZBA certainly indicated, the purpose of the two designated contour lines is different. As stated, the purpose of the FP line is to "promote public health, safety, and general welfare and to minimize losses caused by periodic flooding", while the FEMA line, developed by the Army Corp. of Engineers Flood Management Agency, which identified areas that are subject to periodic flooding up and down the river, is also used for the purposes of flood insurance. The two lines would affect, and impact upon, other properties within the FP zone, to a lesser or greater extent, and thus the existence of the two lines, or even their inequality at this or any point along the river, would not constitute "conditions especially affecting [this] parcel but not affecting generally the district in which it is situated. . ." General Statutes Section 8-6. The ZBA recognized that it could not vary or change the FP line (160) and, therefore, quite appropriately denied defendants' application 89-41; however, in granting 89-42, the only hardship recited CT Page 9645 was that the building predated zoning, no reference being made to the elevation or size of this parcel, or to the two lines.[20]
Simply because two contour lines have been established with reference to properties along the Farmington River, one as the result of the enactment of a zoning regulation to define a zoning district, and another by the Corps of Army Engineers which is used to determine flood insurance limitations, and that the two lines "diverge" at various locations, does not give rise to a condition especially affecting the subject property.
Additionally, even if the divergence of the two lines was viewed as a condition special to this property, the resulting difficulty or hardship is entirely financial: it would be financially beneficial to defendants to have for this property the uses available, as special exceptions, in an I-1 zone, that is, to proceed through the Zoning Commission for permission to have a restaurant and recreational facility in the building.[21]
Defendants have the nonconforming use(s), but have undertaken to go back to substantially what they had before the creation of the FP zone. As footnoted, supra., the applicants were questioned pointedly by ZBA members as to why continued use of the present, nonconforming use would create a hardship.[22] When asked why it was not feasible to continue and upgrade the current use, applicant(s) replied, "well, it is feasible to do that." And, as applicants told the Board, their concern was "justifying the dollars", making it "marketable property", and "spending the dollars on the property"; as plaintiffs have argued, defendant's situation is simply that it is feasible to utilize the property consistent with its existing nonconforming status, but, the property could be utilized more profitably if there were available (through the special exceptions process) all uses allowed under the I-1 classification. As has been stated heretofore, financial distress to the owners of property is not proof of an unusual hardship justifying the granting of a variance. Laurel Beach Assn. v. Zoning Board of Appeals, supra at p. 387. "Financial considerations are relevant only . . . where . . . the application of the regulations to the property greatly decreases or practically destroys its value for any of the uses to which it could reasonably be put . . ." Grillo v. Zoning Board of Appeals, supra at 36970; Berlani v. Zoning Board of Appeals, supra. at p. 171.
C. Variance: Comprehensive Zoning Plan; Change Of Zone
"The comprehensive plan is to be found in the scheme of the zoning regulations themselves." Adolphson v. Zoning Board of Appeals, supra at p. 713; Whittaker v. Zoning Board of Appeals, supra at p. 656. As the text of the Ordinance states, Simsbury has designated all land adjacent to the Farmington River, which is below the 160 contour line, in the FP zone for the purpose CT Page 9646 of promoting public health, safety, and general welfare, and to minimize losses caused by periodic flooding. Here, the land is almost all below the 160 contour, the I-1 uses permitted by special exception granted by the variance would bring the public to the premises (restaurant, bank, health/fitness facility, etc.), and the building is adjacent to the river. Such circumstances do not seem entirely consistent with the intent and purpose of the establishment of the FP zone. While the ZBA's finding that "relief can be granted without detriment to the public welfare" finds some support in the evidence presented to the Board, the court agrees with the plaintiffs that the intensive uses permitted under the I-1 classification (as special exceptions) conflict with the inclusion in the Zoning Plan of a FP zone allowing only more "passive uses", and, that the practical effect of this variance is a change of zone.[23] "Variances `should not be used to accomplish what is, in effect, a substantial change in the uses permitted in a specific zone [;] [t]he power to accomplish such a result is in the zoning commission.'" Adolphson v. Zoning Board of Appeals, supra at p. 708, fn. 4; Bradley v. Zoning Board of Appeals, 165 Conn. 389, 395 (1973).
In reference to this comprehensive plan issue, it is observed that the present situation is distinguishable from that in Adolphson. There, the applicant had the right to operate a foundry as a nonconforming use in an I-1 zone (Fairfield Ordinance). The Supreme Court in upholding the variance stated: "Considering the wide variety of activities permitted in an industrial district 1 zone, we are not persuaded that in granting . . a variance to use [the] property as an automobile repair shop, the board has permitted a use that is not in harmony with the permitted property uses in an industrial district 1 zone, and, consequently, not in accordance with the zoning regulations' comprehensive plan." (Emphasis added). 205 Conn. supra at p. 714. Here, the subject property, with a nonconforming use, is in an FP zone, which does not allow a "wide variety of activities", and such activities as are permitted in the FP are not consonant with, or even comparable to, the more intensive special exception uses permitted in Simsbury's I-1 zone.
Furthermore, with regard to consistency with the comprehensive plan, it is noted that Article Nine of the Simsbury Regulations, dealing with "Non-Conforming Uses", provides:
 "It is the intent of this regulation to permit . . non-conformities to continue until they are removed, but not to encourage their survival. Such uses are declared by this regulation to be incompatible with permitted uses in the districts involved." CT Page 9647 It is further the intent of this regulation that non-conformities shall not be enlarged upon, expanded or extended. . ." (Emphasis added)
It thus appears that the Town's zoning plan contemplates that nonconforming uses will not be expanded, and encourages an early reduction of such uses to conformity.
D. Variance: Expansion of Nonconforming Use.
It is a basic principle of zoning that nonconforming uses should not be allowed to increase. Adolphson v. Zoning Board of Appeals, supra at p. 710; Hyatt v. Zoning Board of Appeals, 163 Conn. 379, 384 (1972); Salerni v. Scheuy,140 Conn. 566, 570 (1954). This principle is reflected in the "Statement of Intent", quoted above, contained in Article Nine of the Simsbury Zoning Regulations. An existing nonconforming use cannot be changed to a use "more obnoxious" than the current use; generally, the intent is "to invite an improvement in the character of a nonconforming use during the period of its continued existence." Stern v. Zoning Board of Appeals,140 Conn. 241, 244 (1953). The Simsbury regulation provides: "A . . . non-conforming use of a structure and land shall not be extended or enlarged . . . by the addition of other uses of a nature which could be prohibited generally in the district involved." The I-1 special exception uses (restaurant, health/fitness facility, etc.) are prohibited in the FP zone and, thus, an expansion of the existing use, by variance, to permit such additional I-1 uses would be contrary to Article Nine, A, of the regulations.[24]
Defendants rely, primarily, on the Adolphson decision. Adolphson did not involve an expansion of an existing nonconforming use, but rather, a change from a prior nonconforming use to a "less offensive" one. Defendants' counsel has argued to this court that Adolphson is on all fours with the present case because this variance simply permits "an enhancement" of the existing nonconformity. However, Adolphson does not refer to "an enhancement", but, as stated, concerns a change to a use specifically found (by the court, based on the ZBA's express findings) to be "less offensive". Here, on this record, no such finding can be made by the court, and the ZBA has not made any such finding. Additionally, in Adolphson, the Court refused to consider the provision in the Fairfield regulations requiring that any changed use be substantially the same in nature as the nonconformity; the Supreme Court's refusal was premised on the plaintiff's failure to raise that issue before the trial court. Here, however, plaintiffs have raised the issue of an expansion of the existing nonconforming use CT Page 9648 and, as stated heretofore, Article Nine, A., of the Simsbury regulations does not permit (or at least, expressly discourages) extension or enlargement of the existing nonconformities.
Much emphasis has been placed on the contention that defendants obtained nothing by the variance that they did not already have, since they must now go back to the Zoning Commission for the granting of a special exception. However, as plaintiffs point out, the I-1 special exception uses would not be obtainable through the Commission but for the granting of this variance; therefore, in the court's view, the granting of the variance effectuated an expansion of an existing nonconforming use.
IV. Conclusion
It is the conclusion of the court that with respect to the merits of this appeal: (1) the defective notice to the abutting towns did not deprive the ZBA of jurisdiction to hear and decide defendants' applications for variances; (2) the hardship stated by the Board is insufficient to support the granting of a variance; (3) the record established before the ZBA does not demonstrate exceptional difficulty or unusual hardship owing to conditions especially affecting the subject parcel, but not affecting generally the district in which it is situated; (4) the granting of the variance does not appear to be harmonious with the town's comprehensive zoning plan, and constitutes a substantial change in the uses permitted in the FP zone; and, (5) the variance is an expansion of a nonconforming use.
The appeal is sustained.
MULCAHY, J.
Footnotes